**COMMONWEALTH of Kentucky,**
Appellant/Cross–Appellee

v.

**Christopher J. MCGORMAN, Jr.,**
Appellee/Cross–Appellant

**2013–SC–000149–DG AND
2013–SC–000818–DG**

Supreme Court of Kentucky.

RENDERED: MARCH 17, 2016

Rehearing Denied June 16, 2016

COUNSEL FOR APPEL-LANT/CROSS–APPELLEE: Andy Beshear, Attorney General of Kentucky, Todd Dryden Ferguson, Assistant Attorney General, Office of the Attorney General

COUNSEL FOR APPELLEE/CROSS–APPELLANT: Dennis James Burke, Assistant Public Advocate, Department of Public Advocacy, Meggan Elizabeth Smith, Assistant Public Advocate, Department of Public Advocacy

## OPINION OF THE COURT BY JUSTICE HUGHES

In September 2001, a Madison County jury found Christopher McGorman Jr. guilty of murder, first-degree burglary, and defacing a firearm. In accord with the jury's recommendation, the trial court sentenced McGorman to life in prison (murder), ten years (first-degree burglary), and twelve months (defacing a firearm), with each sentence to run concurrently.

McGorman appealed his conviction and sentence to this Court, and we affirmed in an unpublished Opinion.[1] Dissatisfied with the performance of his pre-trial and trial counsel, McGorman filed a Kentucky Rule of Criminal Procedure (RCr) 11.42 motion. Additionally, McGorman filed a Kentucky Rule of Civil Procedure (CR) 60.02 motion as an alternative to his RCr 11.42 motion. Both motions were considered by the circuit court, which denied McGorman's request for relief. McGorman appealed that denial to the Court of Appeals, which reversed the judgment of the circuit court and remanded the case for a new trial and, alternatively, an evidentiary hearing. After careful review, we reverse in part the opinion of the Court of Appeals, affirm in part and remand this case to the Madison Circuit Court for an evidentiary hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

During the evening of January 29, 2000, Larry Raney and his mother were visiting an acquaintance who lived in Hancock Valley, a subdivision in western Clark County. McGorman, who was a classmate of Raney, was aware of the visit. McGorman contacted Raney and invited him to visit his parents' residence which was located nearby. After Raney arrived, McGorman lured him down to a barn located behind the residence where McGorman removed a .22 caliber pistol from a jacket pocket and shot Raney in the back of the head, killing him. McGorman dragged Raney's body from the barn to a cornfield beyond the perimeter of the property where he left the body exposed.

After the shooting, McGorman twice contacted fellow student Daniel Cameron, indicating that he had killed Raney and needed assistance in disposing of the body.

1. *McGorman v. Commonwealth*, 2003 WL 21258361 (Ky. May 22, 2003).

Cameron informed his mother about the calls, who in turn contacted law enforcement. When McGorman contacted Cameron a third time, a Clark County deputy sheriff was present and listened in on the call. During the call, McGorman indicated that he had moved the body from the barn to the cornfield and needed Cameron's vehicle to help him transport the body. In response, law enforcement officers went to the McGorman residence to investigate.

When officers approached the barn behind McGorman's residence they found drag marks in the snow that led from the barn into the cornfield. Shortly thereafter, they located Raney's body in the cornfield. They also recovered the murder weapon, a .22 caliber pistol, from McGorman's bedroom closet. Testing later confirmed that blood found on McGorman's pants matched Raney's. Additionally, investigators later obtained from the residence, writings of McGorman in which he admitted to feeling betrayed by Raney and having plans to kill him.

Detective Arlen Horton of the Clark County Sheriff's Department interviewed McGorman, with his attorney present, on February 6, 2001. McGorman made a *Mirandized* statement during which he admitted to entering a neighbor's residence through an unlocked door and stealing a .22 caliber revolver, the weapon he later used to kill Raney. Additionally, fourteen year-old McGorman admitted to planning Raney's death with eighteen year-old Cameron, who had allegedly offered him money and aid to commit the murder. Also, McGorman admitted to police that he had killed Raney and moved his body.

Following his transfer from juvenile court, McGorman was indicted by the Clark County grand jury for murder, first-degree burglary, and defacing a firearm. McGorman filed notice of his intent to introduce evidence of insanity de-fense/mental illness. On March 14, 2001, McGorman was found competent to stand trial. After a jury trial, McGorman was convicted of murder, first-degree burglary, and defacing a firearm and sentenced to life imprisonment.

McGorman initiated post-conviction proceedings by filing a RCr 11.42 motion and, as noted, also a CR 60.02 motion as an alternative to his RCr 11.42 motion. Both motions were joined into a single action which was considered by the circuit court. Subsequently, the circuit court entered a detailed order denying eleven of McGorman's thirteen claims based on a review of the record but the court was unable to resolve the remaining issues on the face of the record. Consequently, the circuit court held an evidentiary hearing to address the issues of whether pre-trial counsel was ineffective by allowing or encouraging an interrogation of McGorman and whether there should have been a mistrial and a new competency evaluation when McGorman watched the guilt phase of the trial in the trial court's law library.

At the evidentiary hearing the circuit court heard testimony from three witnesses: pre-trial counsel, Alex Rowady; trial counsel, Andrew Stephens; and Professor William Fortune of the University of Kentucky College of Law. After reviewing their testimony, the circuit court denied relief on the two unresolved issues contained in McGorman's post-conviction motions.

In a unanimous decision, the Court of Appeals reversed the circuit court's denial of McGorman's post-conviction motions. The Court of Appeals found that McGorman was denied effective assistance of counsel when pre-trial counsel permitted him to be interviewed by police and confess before counsel had him evaluated by a mental health professional or had spoken to a prosecutor about the effect of the

statement. As such, the Court of Appeals remanded the case for a new trial. Additionally, the Court of Appeals determined that the circuit court should have conducted an evidentiary hearing to determine whether a twenty-year plea offer had been conveyed by pre-trial counsel to McGorman. The Court of Appeals denied the other claims raised by McGorman.

The Commonwealth sought discretionary review of the decision of the Court of Appeals. Additionally, McGorman requested that this Court review the allegations of ineffective assistance of counsel which were rejected by the Court of Appeals. We granted discretionary review to evaluate whether the actions of McGorman's counsel constituted ineffective assistance of counsel.

## ANALYSIS

### I. Ineffective Assistance of Counsel Claims Are Reviewed Under *Strickland v. Washington.*

 McGorman's allegations of ineffective assistance of counsel concern both his pre-trial and trial counsel. We evaluate ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this Court in *Gall v. Commonwealth,* 702 S.W.2d 37 (Ky.1985). Under the *Strickland* framework, an appellant must first show that counsel's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. A "deficient performance" contains errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the appellant must show that counsel's deficient performance prejudiced his defense at trial. *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* An appellant must satisfy both elements of the *Strickland* test in order to merit relief. *Id.*

 When faced with an ineffective assistance of counsel claim in an RCr 11.42 appeal, a reviewing court first presumes that counsel's performance was reasonable. *Commonwealth v. Bussell,* 226 S.W.3d 96, 103 (Ky.2007) (*quoting Haight v. Commonwealth,* 41 S.W.3d 436, 442 (Ky.2001) *overruled on other grounds by Leonard v. Commonwealth,* 279 S.W.3d 151 (Ky. 2009)). We must analyze counsel's overall performance and the totality of circumstances therein in order to determine if the challenged conduct can overcome the strong presumption that counsel's performance was reasonable. *Haight,* 41 S.W.3d at 441–42. In addition, the trial court's factual findings and determinations of witness credibility are granted deference by the reviewing court. *Id.* Finally, we apply the de novo standard when reviewing counsel's performance under *Strickland. Bussell,* 226 S.W.3d at 100.

### II. There Was No Error in Trial Counsel Declining to Make a Renewed Competency Motion.

 McGorman alleges error based on the failure of the trial court to hold, and trial counsel to request, another competency hearing during the trial. Prior to trial, McGorman was committed to a mental health hospital to receive treatment, treatment that included psychotropic medication. At the beginning of McGorman's trial he began to rock back and forth and became upset in the courtroom. Due to this behavior, his trial counsel requested that McGorman be removed from the courtroom. McGorman was placed in the trial court's law library, where he was able to watch the proceedings on closed circuit television. McGorman contends that his

counsel was ineffective for failing to ask for a mistrial or to ask for a contemporaneous competency evaluation. Additionally, McGorman alleges error of the trial court for failing to stop the proceedings to conduct a competency hearing. In support of this position McGorman primarily relies on Kentucky Revised Statute (KRS) 504.100(1)[2] and *Gardner v. Commonwealth*, 642 S.W.2d 584 (Ky.1982).

McGorman's reliance on *Gardner* is misplaced. In *Gardner*, a pre-trial motion was filed, seeking an evaluation of Gardner's mental condition. 642 S.W.2d at 585. Of particular emphasis was Gardner's ability to understand the nature of the proceedings against him, as well as his ability to assist counsel in his defense. *Id.* The circuit court took no action on the motion prior to trial. *Id.* During trial, there were multiple incidents where Gardner was totally incoherent and unresponsive to questions put to him by the circuit court. *Id.* Additionally, the circuit court, on its own motion, called a doctor from the Department of Corrections and inquired of Gardner's competency. *Id.* In response, the doctor from the Department of Corrections indicated that she had not performed a competency evaluation. *Id.* This Court ultimately reversed Gardner's resulting conviction, having concluded that the circuit court should have ordered a competency evaluation. *Id.* at 586.

With respect to this case, the trial court explored the issue of McGorman's competency pre-trial and made a determination that he was competent to stand trial.

McGorman now cites his rocking back and forth and becoming visibly upset at trial as evidence of his incompetency. This behavior differs obviously from the incoherent responses which were of concern in *Gardner*. Moreover, the circuit court's conclusion in denying post-conviction relief on the grounds that McGorman's trial conduct did not raise any new competency issues was supported by the trial testimony of three doctors who had examined him.

Dr. Granacher testified that during their last examination McGorman rocked back and forth. Dr. Granacher concluded that this behavior was due to a combination of the anti-psychotic medications that McGorman was taking and his anxiety. Dr. Gallehr also recounted that McGorman had exhibited the rocking behavior during their sessions and further testified that while it was possible for the medications to be the cause of the rocking, he thought that the behavior was more attributable to the stressful situation McGorman was in. Dr. Gallehr concluded that the rocking was a calming behavior for McGorman. Finally, Dr. Buchholz, testified that while he was not an expert on the side effects of the medications taken by McGorman, that those medications could cause abnormal dreams, anxiety, nervousness, confusion, agitation, tremors, emotional instability, mental/mood changes, and twitching.

Thus, on the post-conviction motion there was sufficient evidence of record to conclude that there was no change regarding McGorman's competency.[3] Conse-

---

**2.** "If upon arraignment, or during any stage of the proceedings, the court has reasonable grounds to believe that the defendant is incompetent to stand trial, the court shall appoint at least one (1) psychologist or psychiatrist to examine, treat and report on the Defendant's mental condition." KRS 504.100(1).

**3.** McGorman also refers the Court to Justice Kennedy's concurrence in *Riggins v. Nevada*, for the proposition that psychotropic drugs can render a defendant incompetent to stand trial. 504 U.S. 127, 142, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (Kennedy, J. concurring). McGorman argues that he was likely incapable of rationally assisting in his own defense due to his mental illness or as a result of the

quently, there was no error in counsel's decision not to make a renewed competency motion nor in the trial court's proceeding with the trial without having first conducted a second competency hearing.[4]

## III. There Was No Error in Trial Counsel Waiving McGorman's Presence During Trial.

Similarly, McGorman alleges ineffective assistance of counsel because he was removed from the courtroom during trial without having waived his presence. While the circuit court expressed that a review of the trial record revealed that defense counsel and McGorman's parents were concerned at the time about McGorman experiencing anxiety and stress-related issues, the court was unable to resolve this post-conviction issue on the face of the record.

During the evidentiary hearing, trial counsel testified that he was concerned with McGorman's rocking back and forth during trial. He was worried that the jury might think that McGorman was malingering and that his actions would damage the defense. Given this concern, trial counsel requested that McGorman be excused from the courtroom, and the trial court allowed him to view the trial in the trial court's law library on a closed circuit television. During recesses and breaks in the proceedings, trial counsel met with McGorman to discuss the case.

McGorman alleges that he did not waive his presence at trial and that he had a right to be present during each critical stage of the proceedings. It is well established in federal and Kentucky case law that a criminal defendant has the right to be present in the courtroom during his trial. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial.") (citing *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)); *Carver v. Commonwealth*, 256 S.W.2d 375, 377 (Ky. 1953) ("This court has long recognized the importance of the constitutional right of the accused to be present with his counsel at all stages of a trial.").

Further, McGorman argues that the right to be present and to confront witnesses is personal to the accused under Section Eleven of the Kentucky Constitution and can only be waived by the defendant. In support of this argument, McGorman relies upon the plurality opinion of *Dean v. Commonwealth*, 777 S.W.2d 900 (Ky.1989) (overruled by *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003)). In *Dean*, the Court reversed Dean's conviction due to his being absent during the deposition of two of the Commonwealth's witnesses. 777 S.W.2d at 903. Dean's counsel had waived his presence during that portion of the proceedings. *Id.* However, this Court held that it was Dean's right to be present and confront the witnesses against him under Section Eleven of the Kentucky Constitution. *Id.* There was insufficient evidence in the

side effects from his medications. When McGorman was found to be competent by the trial court he was receiving psychotropic medication. McGorman does not state whether his medication had been altered prior to trial and if so what effect it had on his mental health. Further, McGorman's argument minimizes the conclusions of his own examining doctors which emphasized that the

behavior could be viewed as a coping mechanism employed by McGorman to deal with the stress of trial.

4. 4 As the Court has determined that there was no error in there not being a renewed competency hearing, McGorman is not entitled to a retrospective competency evaluation.

record that it was Dean's intent to waive that right, and consequently, the Court found that counsel's waiver was ineffective. *Id.*

■ However, in opposition to the plurality's holding in *Dean,* this Court has previously held that a defendant's right to be present in the courtroom can be waived by counsel or by the defendant due to his behavior. *See Scott v. Commonwealth,* 616 S.W.2d 39, 42 (Ky.1981) (trial court did not abuse its discretion starting trial in the defendant's absence after accepting waiver of his right to be present during the proceedings given high probability defendant would be disruptive); *Richmond v. Commonwealth,* 637 S.W.2d 642, 647 (Ky.1982) (attorney was permitted to waive a defendant's right to attend a pretrial deposition which would be used as testimony against him at trial). In *Fugate v. Commonwealth,* 62 S.W.3d 15, 19 (Ky.2001), this Court held that counsel was permitted to waive the defendant's presence at a competency hearing.[5] The *Fugate* Court noted that *Dean,* as a plurality opinion of this Court, has limited precedential value.[6] *Id.* at 19, *citing Ware v. Commonwealth,* 47 S.W.3d 333, 335 (2001).

■ Given McGorman's distracting rocking actions during trial, it was reasonable trial strategy for counsel to ask the trial court to permit McGorman to watch the trial proceedings outside the presence of the jury. The waiver by McGorman's counsel was sufficient. However, even if

the Court were to determine that trial counsel erred in waiving McGorman's presence, McGorman is unable to show how he was prejudiced. Trial counsel testified during the evidentiary hearing that McGorman was not assisting in his defense while present in the courtroom. After the waiver, McGorman was able to observe the proceedings via closed circuit television and met repeatedly with his trial counsel during breaks and recesses in the proceedings. McGorman does not demonstrate a reasonable probability that the outcome of the proceedings would have been different had he been physically present in the courtroom for his entire trial. As a result, McGorman failed to demonstrate any prejudice due to his absence from the courtroom during trial.

## IV. The Circuit Court Properly Denied McGorman's Claims That Were Conclusively Disproved Through an Examination of the Record.

■ McGorman also asserts that the circuit court erred in denying several of his claims without an evidentiary hearing. An evidentiary hearing is only necessary "if there is a material issue of fact that cannot be conclusively resolved, *i.e.,* conclusively proved or disproved, by an examination of the record." *Fraser v. Commonwealth,* 59 S.W.3d 448, 452 (Ky. 2001). The first of these claims is McGorman's assertion that he was denied effective assistance of counsel when trial

---

**5.** McGorman also relies on *Price v. Commonwealth,* for the proposition that his exclusion from the courtroom and inability to speak to his attorney in real time was error. 31 S.W.3d 885 (Ky.2000). *Price* concerned the forced removal of the defendant (who was charged with murder of his wife and attempted rape of his young stepdaughter) from the courtroom, during the testimony of his twelve-year-old accuser, by the trial court's order. *Id.* at 892. The situation in *Price* is distinguishable from McGorman's where he was

removed from the courtroom at the request of his own counsel, a request for which there were reasonable supporting grounds.

**6.** Indeed, Justice Leibson, who concurred by separate opinion, noted that the majority opinion was inconsistent with *Richmond* which Justice Leibson found to be a correct statement of the law. *Dean,* 777 S.W.2d at 909–10.

counsel failed to object to Dr. Shraberg's testimony or request a *Daubert* hearing regarding his credentials and testing methods.[7]

Prior to the testimony of Dr. Shraberg, the jury heard from McGorman's mental health expert, Dr. Robert Granacher. Dr. Granacher testified as to how he evaluated McGorman, which included the administration of the Minnesota Multiphasic Personality Inventory (MMPI). Based on the results of McGorman's MMPI, Dr. Granacher concluded that McGorman was not faking his mental state. Trial counsel then inquired about the administration of the Structured Interview of Reported Symptoms (SIRS). Dr. Granacher indicated that the SIRS was used to test for malingering and that it should only be used under circumstances where the patient gives an invalid result on a previous mental health test such as the MMPI. Additionally, Dr. Granacher expressed that it would be inappropriate to administer the SIRS to an adolescent.

Subsequently, the Commonwealth called its mental health expert, Dr. David Shraberg. After the jury heard testimony concerning Dr. Shraberg's qualifications, training, and experience, the doctor testified that he only administered the SIRS to McGorman. He indicated that while the SIRS is generally administered to adults, according to recent reports and literature, it could be administered to juveniles. Based on his evaluation of McGorman, Dr. Shraberg concluded that he was malingering with respect to his mental illness.

McGorman's trial counsel extensively cross examined Dr. Shraberg concerning his method of evaluation. Further, he attacked the singular use of SIRS in comparison to the battery of tests administered to McGorman by Drs. Granacher and Buchholz. Dr. Shraberg explained that his singular administration of SIRS was, in his view, appropriate, the SIRS being the only useful test to administer since previous examinations by other mental health professionals had extensively tested McGorman. Based on a review of this trial testimony, the circuit court concluded that trial counsel did not err by not objecting to Dr. Shraberg's testimony or by not asking for a *Daubert* hearing.

In sum, trial counsel was able to effectively cross examine Dr. Shraberg about how he conducted his evaluation of McGorman. The jury had the opportunity to contrast the detailed examinations conducted by Dr. Granacher and Dr. Buchholz to the examination conducted by Dr. Shraberg. Based on the qualifications and credentials presented in the record concerning Dr. Shraberg, it is highly unlikely that a *Daubert* hearing would have precluded his testimony. In short, McGorman is unable to demonstrate that had trial counsel filed a pre-trial *Daubert* motion, the result would have been any different.

■ Next, McGorman alleges that he was denied effective assistance of counsel when trial counsel failed to object to the admission of several guns owned by Christopher McGorman, Sr., which were irrelevant to the crimes charged. During the Commonwealth's case-in-chief, seven guns belonging to Christopher McGorman Sr. were admitted into evidence. Those weapons were introduced along with other evidence collected from the younger McGorman's bedroom. Introduced along with those seven guns were: a loaded .38 cali-

---

7. A *Daubert* hearing refers to a pre-trial hearing where the trial judge initially determines if the witness's opinion is based on scientifically valid principles and methodology, thereby rendering the opinion relevant and reliable. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

ber revolver, an inert grenade, military field manuals, violent video games, and numerous books, magazines, and other literature referring to firearms, machine guns, and ammunition.

McGorman argues that trial counsel should have objected under Kentucky Rule of Evidence (KRE) 403 to the introduction of weapons which were not connected to the charges he was facing. Specifically, McGorman points to *Major v. Commonwealth*, as support for his position that trial counsel should have objected to the admission of this evidence. 177 S.W.3d 700 (Ky.2005).

In *Major*, the Commonwealth introduced a handgun, shotgun, and rifle, owned by Major prior to the murder, even though there was no evidence that any of those firearms was involved in the crimes for which Major was charged. *Id.* at 710. This Court held that weapons that have no relation to the crime are inadmissible. *Id.* While *Major* was rendered four years after McGorman's trial, it is clear that the Commonwealth should not have sought to introduce into evidence weapons that had no relation to the charged offense.

Even though it was error for trial counsel not to object to the introduction of this irrelevant evidence, McGorman is unable to meet *Strickland's* prejudice standard. Testimony during the trial established that a gun cabinet which housed Christopher McGorman Sr.'s weapons had been moved into McGorman's room only shortly before the shooting, due to ongoing renovations in the home. Further, it was established that McGorman did not have a key to the gun cabinet and would have to ask his parents to gain access to the weapons.

Additionally, the introduction of the seven guns was inconsequential when considering the totality of the relevant evidence introduced during the trial. As McGorman cannot show that this error was so serious as to demonstrate a reasonable probability that the outcome of the proceedings would have been different, the circuit court properly denied postconviction relief on this issue.

■■ McGorman's final claim regarding trial is that counsel was ineffective for failing to object to statements made during the prosecutor's closing argument. The alleged prosecutorial misconduct was the Commonwealth's statement "[t]hese same doctors [defense psychologist and psychiatrist] say he [McGorman] is getting better, does that not scare you folks," and "[t]hese doctors will decide when he gets out." [8] However, prior to these statements, defense counsel, during his closing statement, had urged the jury to find McGorman not guilty by reason of insanity. Trial counsel indicated that if the jury found McGorman not guilty by reason of insanity he would not walk out of the courtroom and into the world, but rather that he would require ongoing mental health treatment. In response, the Commonwealth emphasized that if the jury found McGorman not guilty by reason of insanity that verdict would not guarantee that he would be housed in a hospital for the rest of his life.

■■ Prosecutorial misconduct is "a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Noakes v. Com-*

---

**8.** The Court was unable to find these quotations during the portion of the record cited by McGorman. However, during closing argument the prosecutor did say, "Granacher says he's getting better. Is that scary? He's get-ting better? When he gets better they're gonna let him loose?" The Court interprets this as the statement that is being alleged as prosecutorial misconduct.

*monwealth,* 354 S.W.3d 116, 121 (Ky.2011) (quoting *Black's Law Dictionary* (9th ed.2009)) (brackets and ellipses omitted). It "may result from a variety of acts, including improper questioning and improper closing argument." *Id.* "Any consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the trial. In order to justify reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair." *St. Clair v. Commonwealth,* 451 S.W.3d 597, 640 (Ky. 2014), *cert. denied* —— U.S. ——, 136 S.Ct. 194, 193 L.Ed.2d 152 (2015) (quoting *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky.2004)).

The circuit court determined that the statements of the prosecutor did not prejudice McGorman and denied relief. Indeed, the Commonwealth's statements were part of the Commonwealth's response to trial counsel's statements regarding the insanity instruction. In closing argument "[a] prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth,* 744 S.W.2d 407, 412 (Ky.1987). The challenged statements were proper for closing argument and did not amount to prosecutorial misconduct.

As each of McGorman's three claims regarding his trial could be resolved on the face of the record, the trial court was not required to address them at an evidentiary hearing. Further, for the reasons previously stated, the circuit court properly denied relief on these issues.

## V. There Was No Error in Pre-trial Counsel's Strategy to Permit McGorman to be Interviewed by the Sheriff's Department.

McGorman also argues that he was denied effective assistance of counsel when pre-trial counsel permitted him to give a statement to Detective Horton. During the evidentiary hearing, pre-trial counsel testified as to the circumstances surrounding McGorman's confession. Eight days after the murder, McGorman, along with pre-trial counsel, met with Detective Arlen Horton. According to pre-trial counsel the purpose of this meeting was to focus the police investigation on eighteen year-old Daniel Cameron. It was the view of the defense team that Cameron was the mastermind who devised the scheme to murder Raney and then manipulated the younger McGorman into carrying it out. At the time of McGorman's interview with Detective Horton, pre-trial counsel did not believe that the authorities were aware of the extent of Cameron's involvement in the crime. In focusing the ongoing police investigation on Cameron, pre-trial counsel hoped to mitigate the consequences for McGorman, by identifying him as a lesser actor.

Pre-trial counsel determined that the most effective way to present the evidence against Cameron was for it to come from McGorman himself. Further, due to the overwhelming evidence that the authorities had already obtained against McGorman, counsel believed it was imperative to get the information out about Cameron as soon as possible. The quick timing of the confession was designed to ensure that the information implicating Cameron did not appear to be contrived or fabricated over a long period of time, but rather was reliable information based upon recent events. Prior to permitting McGorman to speak to the authorities, pre-trial counsel consulted with McGorman, McGorman's parents, and the entire defense team about the interview and how it would factor into the overall trial strategy. After hearing this testimony, the circuit court concluded that

the decision to have McGorman meet with the police was a valid defense strategy that did not amount to ineffective assistance of counsel under *Strickland.* Further, the circuit court was not convinced that there was a reasonable probability that the outcome of the proceedings would have been different, but for counsel's decision to advise or encourage McGorman to make the confession at issue.

However, upon review the Court of Appeals reversed the circuit court on this issue. The Court of Appeals determined that it was not reasonable trial strategy for counsel to permit McGorman to be interviewed by the detective and confess, when pre-trial counsel had not spoken to a prosecutor about the effect of the statement on the charges McGorman was facing or without first having had McGorman's mental health examined.

 To determine whether pre-trial counsel's actions were a reasonable defense strategy, we begin by reviewing the obligations of counsel concerning an investigation. Under *Strickland,* counsel has an affirmative duty to conduct reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Commonwealth v. Tigue,* 459 S.W.3d 372, 394 (Ky.2015). That investigation need not be "an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources, but also with the benefit of hindsight, would conduct," but rather "must be reasonable under all the circumstances." *Haight,* 41 S.W.3d at 446, *overruled on other grounds* by *Leonard,* 279 S.W.3d at 151.

In his argument to the Court of Appeals, McGorman emphasized the importance of counsel conducting a thorough investigation into the case. In support of this contention, McGorman first urged that court to consider *Porter v. McCollum,* 558 U.S. 30, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009). At issue in *Porter* was the failure of counsel to discover or present mitigating evidence during the penalty phase of Porter's murder trial. *Id.* at 448. Porter's counsel put on one witness during the penalty phase but did not introduce any evidence related to Porter's mental health. *Id.* at 449. At a post-conviction hearing, significant mitigating evidence was introduced including; evidence of an abusive childhood; heroic military service and associated traumas; long-term substance abuse; and his impaired mental health and mental capacity. *Id.* Further, it was revealed that counsel had failed to interview witnesses or obtain relevant records. *Id.* at 453. Given this failure of counsel to conduct some sort of mitigation investigation, the U.S. Supreme Court reversed Porter's conviction. *Id.*[9]

McGorman also cited the Court of Appeals to *Towns v. Smith,* 395 F.3d 251 (6th Cir.2005). In *Towns,* trial counsel failed to investigate a witness who had admitted to police his involvement in the crimes for which Towns had been charged. *Id.* at 253. Further, in the witness's statement to police, he identified his accomplices, which did not include Towns. *Id.* During trial, the prosecutor opted not to call the witness. *Id.* at 254. After trial counsel was informed of this decision, he informed the court that he would need to speak to the witness before being able to decide whether or not to call him at trial. *Id.* Despite the witness being held overnight by the trial court, there was no record of counsel speaking to the witness, and ulti-

9. Similarly, McGorman asked the Court of Appeals to review *Dickerson v. Bagley,* 453 F.3d 690 (6th Cir.2006). As in *Porter, Dicker-* son concerned the failure of counsel to conduct a sufficient mitigation investigation in a capital case. *Dickerson,* 453 F.3d at 696.

mately the witness was not called to testify. *Id.* Towns's conviction was reversed as it was determined that it was objectively unreasonable for counsel to make the decision to not call the witness without either investigating or, at least, making a reasoned professional judgment that an investigation was unnecessary. *Id.* at 259–260.

*Porter* and *Towns* are clearly distinguishable from McGorman's case. *Porter* concerned the failure of counsel to conduct an adequate mitigation investigation for a capital case. Counsel's willful blindness in not obtaining records or interviewing witnesses precluded the discovery of a significant amount of mitigating evidence. In *Towns,* counsel was aware that a witness was available who had given a statement to police which inculpated himself and exculpated Towns. Towns's counsel's failure to call that witness at trial, or at a minimum speak to that witness, could not be deemed reasonable trial strategy.

In contrast, the evidence in this case was clear to pre-trial counsel when he began his representation of McGorman. Police had listened in on a phone call during which McGorman admitted to needing help moving Raney's body. The murder weapon and McGorman's bloody clothes were discovered in his residence shortly after the murder. In sum, the evidence of McGorman's involvement in the murder was overwhelming. McGorman is unable to point to what additional proof or evidence could have been obtained by pre-trial counsel conducting a protracted investigation prior to permitting him to speak to the detective. Moreover, in the judgment of pre-trial counsel, McGorman's best defense, given the strong prosecution case against him, was to lessen his culpability by inculpating Cameron. The decision to speak to law enforcement officers about Cameron's involvement came after significant deliberation where pre-trial counsel consulted with his co-counsel, investigators, and McGorman's family.

In support of his attack on pre-trial counsel's decision to permit McGorman to speak to the detective, McGorman relies on the opinion of Professor Fortune. In his review of the case, Professor Fortune concluded that it was unreasonable for pre-trial counsel to permit McGorman to speak to the authorities without first conducting a full investigation and receiving discovery. Additionally, Professor Fortune offered the opinion that it would be unreasonable for counsel to permit his client to make a statement to the authorities without the involvement of a prosecutor so as to make that statement inadmissible in the event that plea negotiations failed. While Professor Fortune's views are certainly well-grounded, they offer one perspective as to how counsel could have approached the defense of McGorman. However, as the Supreme Court stated in *Strickland,* "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689, 104 S.Ct. 2052.

▪ Given the overwhelming evidence against McGorman, his pre-trial counsel pursued a strategy that he hoped would minimize McGorman's culpability. The failure of that strategy does not mean that pre-trial counsel was ineffective. Rather, "[a] reviewing court, in determining whether counsel was ineffective, must be highly deferential in scrutinizing counsel's performance. The tendency and temptation to second guess is strong and should be avoided." *Harper v. Commonwealth,* 978 S.W.2d 311, 315 (Ky.1998), *cert. denied,* 526 U.S. 1056, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999). Under the circumstances of this case, the strategy employed by pre-trial counsel was reasonable. Pre-

trial counsel attempted to minimize the culpability of McGorman by offering a prompt, detailed statement focusing on Cameron's involvement, a statement that was necessary given the overwhelming evidence of McGorman's guilt. While the strategy was unsuccessful, the pursuit of such a strategy under these circumstances was not error.[10],[11]

## VI. The Circuit Court Should Have Conducted an Evidentiary Hearing Concerning the Alleged Offer by the Commonwealth of a Twenty–Year Plea Agreement.

■ McGorman also alleges error based on pre-trial counsel's failure to convey a twenty-year plea offer to him. During the evidentiary hearing on other aspects of his representation of McGorman, pre-trial counsel testified that in the fall of 2000, he received a twenty-year plea offer from the prosecution. Pre-trial counsel was unable to recall whether he had conveyed that offer to McGorman, but was certain he had conveyed that information to McGorman's parents and that it had been summarily rejected. Following the evidentiary hearing, McGorman and his parents executed affidavits denying knowledge of the Commonwealth's offer and McGorman amended his RCr 11.42 motion to include failure to convey the plea offer. The trial court summarily denied relief on

this specific issue. The Court of Appeals held that, irrespective of the other ineffective assistance claims, an evidentiary hearing should be held on remand to address this alleged plea offer. We agree.

■ In determining whether counsel is effective during plea negotiations the Court must assess "what risks were attendant to trial versus the benefits to be gained vis á vis a plea bargain, and counsel's conduct with respect to communicating these factors to the defendant." *Osborne v. Commonwealth*, 992 S.W.2d 860, 864 (Ky.App.1998). While the circuit court heard testimony during the evidentiary hearing concerning the alleged twenty-year offer, that issue was not a focus of the hearing, having seemingly been unknown to McGorman's post-conviction counsel prior to pre-trial counsel's testimony. On remand, the circuit court is directed to hold an evidentiary hearing to fully explore this issue. Should the circuit court determine that McGorman has a valid claim, then it will need to order appropriate relief.

## CONCLUSION

For the foregoing reasons, the opinion of the Court of Appeals is reversed in part, affirmed in part and this case is remanded to the circuit court for proceedings consistent with this Opinion.

---

10. The Court of Appeals also concluded that pre-trial counsel erred in failing to have McGorman evaluated by a mental health professional prior to his speaking to Detective Horton. During the trial, McGorman's mother testified that she and her husband filed a document in the Clark Circuit Court that they had no knowledge or information that McGorman may have been suffering from mental illness at or prior to the time of the crime. Pre-trial counsel testified that there was no indication of any mental issues with McGorman when they first met. Rather, issues with McGorman's mental state surfaced after he was indicted. The suggestion that pre-

trial counsel should have had McGorman evaluated when he was not aware of any mental issues is an argument based solely in hindsight. There was no error in pre-trial counsel not having McGorman evaluated under these circumstances.

11. As the judgment of the Court of Appeals has been reversed and this case has not been remanded for trial, the issue of whether McGorman's confession could be used at retrial is moot and will not be addressed further.

Minton, C.J.; Cunningham, Venters, and Wright, JJ., concur. Noble, J., concurring in part and dissenting in part by separate opinion. Keller, J., not sitting.

## NOBLE, J., CONCURRING IN PART AND DISSENTING IN PART:

I agree with the majority that it is appropriate for a hearing on remand to be held to determine whether a plea offer was made and conveyed to McGorman. I disagree, however, that pretrial counsel's[12] allowing the Appellee, a fourteen-year-old boy, to give a taped confession to police officers six days after the murder occurred without first seeking a psychological evaluation of the child or conducting plea negotiations with the Commonwealth's Attorney is effective assistance of counsel. Pretrial counsel claimed that the confession was part of an overall strategy to cast blame on another party, Daniel Cameron, an eighteen-year-old friend, who was claimed to be the driving force behind the murder. The majority concludes this was a reasonable strategy given the circumstances. I disagree and would, instead, find that pretrial counsel's strategy was ineffective and unreasonable.

I acknowledge that what happened in this case is particularly chilling. The Appellee, a fourteen-year-old boy, lured another boy to his home for a visit, persuaded the boy to go with him out to a barn, and shot the boy in the back of the head, killing him. The Appellee then tried to bury his victim, seeking help from Daniel Cameron, who admitted he knew that Appellee was planning to kill the victim.

Or, presented another way, a fourteen-year-old boy, who heard voices and was so afraid that he was going to be hurt that he carried a gun with him when he went to take out the trash, fixated on the victim and planned for a month to kill him because he believed the victim had betrayed him, and was going to "tell on" him and Daniel. The boy, according to the court-appointed evaluator for trial, was so psychotic at the time he was not criminally responsible for his actions.

Unfortunately, defense counsel did not obtain this information before he advised the Appellee and his parents that the Appellee should make a full recorded confession to the police. And there is no question that defense counsel was in a difficult position from the time he began representation of Appellee.

This is what defense counsel knew: According to Appellee, Daniel Cameron was a close friend and agreed with Appellee that the victim had betrayed them, and agreed that Appellee should kill the victim, even offering the Appellee money to do so. On the day the murder occurred, Appellee called Daniel three times, first to tell him that he had killed the victim, and later to ask Daniel to come help him bury the victim. On the third call, however, Daniel had apparently notified police about what had happened, and a local officer listened in on the call. He heard Appellee say that he had a body, but could not bury it by himself, and then ask Daniel to bring his vehicle to transport the body. He said the body was in a cornfield. A detective then went to Appellee's home to ask about the missing boy. Appellee denied that he was there. But the detective checked the barn, saw where something had been dragged, and located the body in the cornfield. The murder weapon was found in Appellee's closet. But Daniel had clearly put himself in a good position with the police by telling them of the murder.

Thus, defense counsel had a difficult set of facts to consider as he began Appellee's defense. But those very facts are why the

---

**12.** 12 The Appellee employed different counsel for trial.

strategy of confessing and trying to bring Daniel in as a mastermind was not viable. Daniel already had ingratiated himself with police. No child in his right mind would have acted the way Appellee did. There was no indication that Daniel had overridden Appellee's will or actually persuaded him to take any action. Appellee had already made admissions overheard by the police officer listening in on the phone. The police had the body and the murder weapon. What could the defense possibly gain from a full, video-taped confession only six days after the murder?

Defense counsel indicated at the Criminal Rule 11.42 hearing that he believed that being truthful would soften the police and prosecution toward his client. This is a strategy that has not proven to be very effective for defendants who confess in the hope of making an officer a buddy. The officer still has a job to do and does it, as the police and Commonwealth did here. Potentially, if some blame could be shifted toward Daniel, perhaps the penalty would be mitigated, but that is highly speculative under these facts. And, unless the Commonwealth Attorney could be persuaded to consider the information about Daniel in making a plea offer, any effect would be a question for the jury.

What actually happened here was that defense counsel had Appellee take a lie-detector test to see if he was being truthful about Daniel's involvement. The test showed that he was. Defense counsel then took him to confess to police. He did not seek any kind of psychological evaluation, and thus did not consider the possible effect the Appellee's emergent schizophrenia might have had on the lie detector test, as some studies indicate that persons suffering from a psychosis can pass a polygraph because they actually believe their delusions. Nor did he consider where he was left to go in defending Appellee if the case progressed to trial, which it did.

And that is where the harm from this course of action really comes to fruition. The sole defense at trial was insanity. Two experts, Dr. Granacher, retained by the defense, and Dr. Bucholtz, appointed by the court, testified that Appellee was not criminally responsible when he committed the crime because he was then in a psychotic state. But how much weight can this testimony have when the jury watched a video of a calm, if rambling, Appellee confess just six days after the murder? This premature confession undercut the only complete defense Appellant had—insanity. And even though Dr. Bucholtz testified that it could be difficult to tell how disturbed a person is even when under a psychoses, what the jury actually saw is highly persuasive.

And the jury did struggle with their decision. They sent out two questions trying to determine what kind of verdict they could reach. A third note told the court that they could not agree, and were hung. It was only after the jury was given an *Allen* charge that a verdict was reached. Defense counsel's job was to present his client's best defense and to seek the most favorable penalty if he was found guilty. Without the video-taped confession, while the jury clearly still had sufficient evidence to convict for murder, it is foreseeable that a different penalty would be reached. Certainly, the expert's testimony would have had the chance to be given more weight.

It has been argued that counsel's strategy was successful, because there was an offer from the Commonwealth of 20 years, when the jury actually recommended life. But that remains an undecided issue, both as to whether the offer was ever actually made, and whether it was conveyed to Appellee or his parents. This case is go-

ing back for a hearing to determine the facts of that situation. If the offer was not made, or was not conveyed, then this argument fails, and one is hard pressed to see any possible advantage to the chosen strategy.

Indeed, Appellee's parents removed the initial counsel from the case about 60 days before trial, because they believed he was not adequately representing their child. The successor attorney, who tried the case, could not effectively contest guilt in light of the confession, had only the insanity defense to deploy, and could not make any significant points about Daniel's involvement. In fact, the whole "blame Daniel" theory is not supportive of seeking an acquittal by reason of insanity. The defense at trial only went to establishing that Appellee was psychotic at the time he committed the crime.

I cannot perceive that any reasonable attorney would make the decision to have a child who has just behaved in such a drastic way give a video-taped confession to police six days after the crime without first having a psychological evaluation done, or attempting to plea bargain with the prosecutor (who said he did not take "proffers" but did engage in plea bargaining). This decision relies on chance-taking rather than a reasonable approach to defending such an obviously damaged child. It does appear to me that the "errors were so serious as to deprive the defendant of a fair trial" because affecting the penalty is certainly a significant part of the trial.

Consequently, I agree with Professor Fortune who testified at the Criminal Rule 11.42 hearing that pretrial counsel was ineffective, and I also agree with the Court of Appeals' reversal ordering a new trial in this matter. A case so doomed from the beginning because of more than its facts is best done over. And that is true even if it is only the penalty that is retried, as is the

case here because Appellant did not contest that he committed the crime.