RENDERED: AUGUST 29, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

2017-SC-000651-DG
AND
2018-SC-000151-DG

FINAL

DATE 9-23-19 By CCH

COMMONWEALTH OF KENTUCKY

APPELLANT/CROSS-APPELLEE

V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2016-CA-000788-MR
LAWRENCE CIRCUIT COURT NO. 03-CR-00062

ALGER FERGUSON

APPELLEE/CROSS-APPELLANT

## OPINION OF THE COURT BY JUSTICE WRIGHT

## REVERSING AND REINSTATING

The Commonwealth of Kentucky appeals from the Court of Appeals' reversal of the trial court's denial of a motion for relief pursuant to Kentucky Rules of Criminal Procedure (RCr 11.42). The Court of Appeals held that Appellee/Cross-Appellant, Alger Ferguson's, counsel was ineffective in representing Alger during his murder trial leading to his conviction. Therefore, the appellate court reversed and remanded to the trial court for a new trial. Alger cross-appeals, asking this Court to affirm the Court of Appeals' result even if we disagree with the standard applied by that court.

## I. BACKGROUND

On August 9, 2003, Alger was at his home with his nephew, Parker Ferguson. The two had been shooting guns earlier in the day and had spent the evening drinking and smoking marijuana together. Parker suffered two

gunshot wounds—one above his lip and another to his temple, which was fatal. Alger was the only other person in the home at the time. Alger called the police and, when they arrived on the scene, told them Parker had shot himself. A .40 caliber Browning semi-automatic pistol was on the floor next to Parker's body. According to the autopsy, the shot above Parker's lip was taken from a distance of at least 18-24 inches away and would not have been immediately disabling. The contact wound to Parker's temple was immediately incapacitating. Alger was indicted for Parker's murder.

Alger was represented at trial by private attorney Leo Marcum.[1] Two to three weeks prior to the start of trial, Alger informed Marcum that he would be representing himself. Before trial, Marcum obtained a competency evaluation for Alger. Then, the morning of trial, Alger informed Marcum that he wanted him to start the trial and he would step in at some point. That morning, Marcum was successful in having the trial court suppress certain evidence. During voir dire, Marcum told the court he only had one testifying witness— Alger. Alger complains that Marcum had neither consulted nor hired experts

---

[1] The dissent goes through the litany of Marcum's disciplinary history, including his permanent disbarment in 2012 for failing to file state income taxes between 2004 and 2009. The dissent points out that Marcum was disciplined for, among other things, failing to provide competent representation to two clients during the same timeframe he represented Alger. The dissent's concern about Marcum's disciplinary history is understandable. However, Marcum's disciplinary issues in the past (or even contemporaneously with his representation on Alger) is not evidence that his representation in the current case was ineffective. The violation of our Kentucky Rules of Professional Conduct in *other* cases has no bearing on whether he was ineffective in representing Alger, much less whether that supposed ineffectiveness met the standards discussed below which would necessitate reversal in this case.

and that he did not find other witnesses to support his defense theory, which was that Parker's death was a suicide. Alger also complains that Marcum made no opening statement. However, in fact, Marcum did not fail to give an opening statement; rather, he reserved his opening statement until after the close of the Commonwealth's case. This is not uncommon trial practice among the criminal defense bar. Oftentimes, defense attorneys elect to hear the evidence presented against their clients prior to giving their opening statements. In this case, Marcum was uncertain at the beginning of trial if his client would testify to a believable fact pattern—and had been told by Alger in the weeks leading up to trial that Alger planned to represent himself.

The Commonwealth's witnesses included Kentucky State Police Detective Paul Cales, Coroner Keith Moore (who was also a retired KSP detective), and State Medical Examiner William Ralston. These witnesses testified regarding the investigation, blood spatter evidence, the firearm, and Parker's autopsy. Some family members also testified regarding Alger's behavior on the night of Parker's death. Marcum cross-examined each of the witnesses, though Alger now complains about the nature of said cross-examination. Alger now complains that Marcum did not object when the Commonwealth's witnesses testified as to their opinions concerning the capability of the firearm in question—and the Court of Appeals also made much ado of this point. However, we note that Marcum actually solicited the information about the firearm during his cross-examination—and that it was *beneficial* to Alger's defense as it supported the version of events to which he would later testify.

3

At the close of the Commonwealth's case, Alger moved to proceed pro se and the trial court granted his motion—with Marcum as stand-by counsel. Alger re-called some of his family members who had testified for the Commonwealth and cross-examined them and then testified on his own behalf. The jury convicted Alger and recommended a sentence of life imprisonment. The trial court sentenced him accordingly. Alger filed a direct appeal to this Court and we affirmed the trial court in *Ferguson v. Commonwealth*, No. 2006-SC-000156-MR, 2007 WL 4462368 (Ky. Dec. 20, 2007). Alger then filed a pro se RCr 11.42 motion to vacate his conviction due to alleged ineffective assistance of counsel. Eventually Alger obtained post-conviction counsel with the Department of Public Advocacy (DPA) to assist in his 11.42 proceedings. DPA retained Shelly Rice, a crime-scene reconstructionist, to prepare a report and testify at the hearing on Alger's 11.42 motion. Rice's report spanned more than 100 pages and discussed different aspects of the case such as the firearm at issue, self-inflicted non-contact wounds, blood spatter evidence, and her perceived deficiencies in the Commonwealth's case. Rice opined that it was more likely than not that both of Parker's gunshot wounds were self-inflicted.

The trial court heard Rice's testimony and that of Alger, Marcum, and DPA regional director Roger Gibbs at the hearing. It ultimately denied Alger's motion based on *Strickland v. Washington*, 466 U.S. 668, 687 (1984). There, the Supreme Court of the United States held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that

4

counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

In making this finding, the trial court stated: "The Defendant, in claiming that the victim committed suicide, had what the Court believes to be an almost insurmountable burden of convincing the jury that the victim first shot himself at an angle from an upper trajectory [(we note that the evidence was actually that the bullet entered above Parker's lip at a downward trajectory)] at a distance of more than two feet, only wounding himself, and then put the gun to his head and killed himself." Marcum had testified at the hearing that this defense was a difficult one of which to convince the jury. The trial court agreed. It held that "the representation of [Alger's] former attorney, within the parameters with which he had to operate, was not deficient." It further held that "if expert witnesses had been obtained and more vigorous cross-examination of the Commonwealth['s] witnesses had taken place, there does not exist a reasonable probability that the outcome would have been different, and that therefore the Defendant's rights were not prejudiced."

On appeal, the Court of Appeals acknowledged the *Strickland* standard, but did not base its reversal on it. Rather, it applied the standard set forth in *United States v. Cronic*, 466 U.S. 648, 659 (1984), which stated: "if counsel entirely fails to subject the prosecution's case to meaningful adversarial

5

testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."

Applying *Cronic*, the Court of Appeals held that, while "Alger's trial counsel performed some *pretrial* work on behalf of his client, including a successful motion to suppress[,] . . . an examination of the record *at trial* reflects that counsel made no genuine effort to support his client's suicide defense." Therefore, the Court of Appeals held Marcum had completely failed to represent Alger at trial and failed "to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659. Based on this review, the Court of Appeals reversed the trial court's denial of RCr 11.42 relief and remanded for a new trial. We disagree with the Court of Appeals and, therefore, reverse its holding and reinstate the trial court's order denying RCr 11.42 relief. Alger cross-appeals asking this Court to affirm the Court of Appeals' result even if this Court disagrees that *Cronic* is the appropriate standard. However, for reasons that follow, we reverse based on the *Strickland* standard as well.

## II. ANALYSIS

We will first analyze whether *Cronic* is the appropriate standard to apply in this case. In *Bell v. Cone*, 535 U.S. 685, 696-97 (2002), the Supreme Court of the United States explained: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' *Cronic, supra,* at 659 . . . (emphasis added)." The *Cone*

6

Court went on to state that, in that case, the argument was "not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic,* this difference is not of degree but of kind." *Cone,* 535 U.S. at 697.

The same is true here. While Alger would have preferred that his attorney conduct cross-examination of witnesses in a different manner, that is more a question of "degree" than of "kind"—just as was the case in *Cone.* Marcum *did* cross-examine the Commonwealth's witnesses, often bringing out points that supported his client's story. Furthermore, he obtained a competency evaluation for Alger and got certain evidence suppressed on the morning of trial. Marcum had reviewed the record, met with his client numerous times, and interviewed Alger, the investigating officer, the Commonwealth's Attorney, and others in the community.

This case simply does not rise to the requisite level to warrant the application of *Cronic* rather than *Strickland.* We will now consider whether the Court of Appeals' result should be upheld under *Strickland.* As noted, under that standard, we must first determine whether the counsel's representation was deficient and then determine whether such deficiencies prejudiced the defense in such as way as to "deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687.

This Court has held, "[t]here is a strong presumption that counsel's conduct falls within a wide range of reasonable professional

7

assistance." *Commonwealth v. Bussell*, 226 S.W.3d 96, 103 (Ky. 2007) (internal citations and quotations omitted). Furthermore, "[a]s a reviewing court, we 'must focus on the totality of evidence before the judge or jury and assess the overall performance of counsel throughout the case in order to determine whether the identified acts or omissions overcome the presumption that counsel rendered reasonable professional assistance.'" *Id., quoting Haight v. Commonwealth*, 41 S.W.3d 436, 441-42 (Ky. 2001), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009).

As we have held:

> We must analyze counsel's overall performance and the totality of circumstances therein in order to determine if the challenged conduct can overcome the strong presumption that counsel's performance was reasonable. *Haight*, 41 S.W.3d at 441-42. In addition, the trial court's factual findings and determinations of witness credibility are granted deference by the reviewing court. *Id.* Finally, we apply the de novo standard when reviewing counsel's performance under *Strickland. Bussell*, 226 S.W.3d at 100.

*Commonwealth v. McGorman*, 489 S.W.3d 731, 736 (Ky. 2016).

We will turn to the facts in the case at bar in order to apply this deferential standard. Alger argues that his counsel was deficient at trial for several reasons including the fact that he did not consult with experts in preparation for trial or have experts to testify at his trial. At the RCr 11.42 hearing, Alger's newly-attained expert opined that it was more likely than not that Parker had shot himself, thereby causing his own death. Therefore, Alger now faults Marcum for not conducting an appropriate investigation into the defense. However, as this Court has stated, counsel's "investigation need not

8

be 'an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources, but also with the benefit of hindsight, would conduct,' but rather 'must be reasonable under all the circumstances.'" *McGorman,* 489 S.W.3d at 743, *quoting Haight,* 41 S.W.3d at 446.

Here, the circumstances were difficult. The victim had two gunshot wounds to his head—one of which the medical examiner opined had occurred from a distance of eighteen to twenty-four inches away, as it did not have characteristics of stippling as would occur in a closer shot. Furthermore, this shot above Parker's lip had entered from above and to the side, having a downward, lateral trajectory. Marcum testified at the RCr 11.42 hearing that having an expert to testify that Alger could have shot himself in such a manner as consistent with the bullet entry wound would not have been beneficial, as it seemed to be a "palpable lie."[2]

To delve further into the circumstances surrounding Marcum's decision, we note that the handgun was more than seven inches in length. It is difficult to imagine a scenario in which that handgun could be manipulated in a manner to create a downward, lateral trajectory from two feet away so as to

---

[2] The dissent argues that Alger was entitled to an attorney who zealously asserted his position. SCR 3.130(1.2). We agree with that statement. However, it is clear that Alger's position was that Parker had shot himself in the temple and then the gun discharged a second time when it struck the floor, causing the wound above Parker's lip. Each of Rice's theories regarding Parker's death being a suicide was completely contradictory to Alger's testimony. These theories would have shown Alger's testimony to be a "palpable lie," as was Marcum's concern in determining trial strategy.

9

strike the person operating the firearm in the mouth. In fact, when asked on cross-examination during the RCr 11.42 hearing, Rice could not demonstrate how this was physically possible. Rice merely asserted, without having tested the gun in question, that it is possible that stippling may not have been present if fired from as close as twelve inches away. She arrived at this figure from a case she had found in academic literature of a self-inflicted gunshot wound fired from a .38 caliber (significantly less powerful) handgun from twelve to eighteen inches away which did not cause stippling. She faulted the Commonwealth and defense for not performing testing that she did not perform herself.

But, even if we were to assume that Rice was correct that it was physically possible for Parker to have self-inflicted this wound, her testimony goes in direct contradiction to Alger's own testimony and defense theory. According to Alger, Parker was holding the gun to his head when Alger exited the room before hearing two gunshots. He believed the gun discharged the second time when it hit the floor. Therefore, Rice's suicide theory stands in direct contradiction from the testimony of Alger, the only witness.

Furthermore, the semi-automatic handgun was not in the cocked position when recovered by police. After being fired, a semi-automatic firearm would return to the cocked position, ready to fire again. Alger explained why the gun was not cocked when police found it, as he stated he had picked it up and un-cocked it before putting it back on the floor next to his nephew's body. Rice, however, testified at length about the importance of the position of the

10

gun to her analysis. She also faulted Marcum for failing to consult with an expert or test the gun to determine whether it could have somehow malfunctioned, causing it to be de-cocked after Parker shot himself. However—again—this would have been in direct conflict with Alger's testimony that the gun was found in the un-cocked position because he had de-cocked it himself.

Rice also placed much importance about a live round found near Parker's feet, and indicated it showed potential characteristics of a misfire. She said this would corroborate Alger's statement that Parker was handling the gun in a manner in which it was not intended to be handled. However, we note this live round could have been ejected from the gun by Alger or been the result of a misfire when he was handling the weapon. It in no way definitively links Parker to his own death. This evidence has little to no bearing on the fact pattern as put forth by Alger in order to create a reasonable likelihood the result at trial would have been different.

Rice had the benefit of hindsight and was able to examine the entirety of the trial in making her determinations. However, even with that, we fail to see how any of the theories she presents regarding the weapon show Marcum's representation was deficient to such a degree as to require reversal under *Strickland.*

Rice also takes issue with the blood spatter evidence adduced at trial. She asserts that a void in Parker's hand and blood found on it indicate that it is likely that he shot himself. However, as noted, it is difficult to see how Parker could have held the gun in order to have inflicted the shot above his lip.

11

The photographs to which she directs our attention do show a void in the blood stains in the palm of Parker's hand, however, the Commonwealth asserted at trial that was caused by the beer can found near his body.

Rice also argues that blood spatters and blood flow patterns indicate that Parker was seated in the chair when the first shot entered above his lip and then slid to the floor, where he was seated upright when the second shot entered his temple. Again, however, this is in direct contradiction of Alger's testimony that Parker first shot himself in the temple before the second shot entered above his lip, caused by the firearm discharging as it struck the floor.

Roger Gibbs, a regional DPA director, also testified at the RCr 11.42 hearing as an expert in criminal defense. While he was critical of Marcum's preparation and representation of Alger, he could not say that had Marcum consulted experts that it would have made enough difference "to carry the day." This simply does not rise to the *Strickland* standard which requires that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Despite their criticism of Marcum's representation, neither the testimony of Rice nor that of Gibbs created a "reasonable probability that . . . the result of the proceeding would have been different." *Id.* The manner in which Rice arrived at her conclusion that it was more likely than not that Parker's death was a suicide completely undermined Alger's own testimony and defense

12

theory. Alger did not abandon this theory after his conviction—as it is put forth in his RCr 11.42 motion as well.

Alger now asserts that he was indigent at trial as evidenced by the fact that he never paid Marcum's fee—and that Marcum should have sought funds from the court to obtain expert consultation or testimony. However, there was never a determination of indigency here. We cannot go outside the record and assume that Alger failed to pay Marcum due to indigency rather than that he failed to pay him for some other reason. In this case, Marcum indicates that he and Alger *did* discuss obtaining an expert and that they both agreed it would not be beneficial. Further, we fail to see how the lack of an expert to consult or testify deprived Alger of a reliable result at trial. Even the theories Rice could concoct with the benefit of hindsight were largely fantastical.

Alger also argues that Marcum's representation was deficient as he was unprepared for trial. He says this is evidenced by the fact that he did not make an opening statement. We note that while Marcum postponed making an opening statement until the close of the Commonwealth's case, he did not, as Alger asserts, simply fail to make one due to unpreparedness. Rather, Marcum knew from his many conversations with Alger that his client planned to testify at trial. He reserved his opening, however, because he was unsure as to the exact content of what Alger planned to say in his testimony, as some of his statements to police differed slightly from what Alger told Marcum he planned to say at trial.

13

Marcum indicated at the RCr 11.42 hearing that "Alger made it almost impossible to get ready" for trial and that "he wouldn't assist with his defense in any meaningful way." As noted earlier, Marcum was under the belief that Alger would represent himself until the very day of trial. Of course, he was still the attorney of record and had duties to his client, as Alger had not yet moved the court to proceed pro se. However, Marcum had prepared for the trial throughout his twenty-six months of representation. Furthermore, Marcum testified that Alger once revealed his trial strategy to him during a conversation about self-representation. According to Marcum, Alger stated he had a way "to get out of this." Marcum testified that Alger told him "that he wasn't going to go to prison because the women on the jury panel wouldn't allow it."

Alger complains that Marcum did not effectively cross-examine the Commonwealth's experts. However, as discussed above, in many of these complained-of instances, Marcum was able to elicit information on cross-examination that supported Alger's story as to how the events unfolded on the night of Parker's death. Even if these experts were not shown to be qualified to give the opinions regarding firearms and blood spatter that they gave, Marcum (sometimes soliciting these opinions himself) used them to his client's advantage.

While it is true that Marcum did make some mistakes at trial, those mistakes did not render his assistance ineffective. For example, Marcum inadvertently opened the door to some (but certainly not all) evidence he had gotten suppressed at trial. Marcum was also not successful in introducing

14

certain impeachment evidence. The dissent also insists that Marcum was deficient in failing "to subject the Commonwealth's theory of motive to proper scrutiny." We must keep our standard of review in mind in light of these purported deficiencies. "As a reviewing court, we 'must focus on the totality of evidence before the judge or jury and assess the overall performance of counsel throughout the case in order to determine whether the identified acts or omissions overcome the presumption that counsel rendered reasonable professional assistance.'" *Bussell*, 226 S.W.3d 96, 103, *quoting Haight*, 41 S.W.3d at 441-42.

## III. CONCLUSION

Marcum testified he was faced with a difficult defense and a client who would not consider taking a plea deal because he was certain he could sway the female members of the jury panel in his favor. There is not a reasonable probability that the outcome of the trial would have been different but for any of Marcum's purported deficiencies. Therefore, we agree with the Commonwealth and reverse the Court of Appeals and reinstate the trial court's order denying Alger RCr 11.42 relief.

All sitting. Minton, C.J.; Buckingham, Hughes, Keller, VanMeter and Wright, JJ., concur. Lambert, J., dissents by separate opinion.

**LAMBERT, J., DISSENTING:** Respectfully, I dissent. I would affirm the Court of Appeals and hold that Leo Marcum provided Alger Ferguson ineffective assistance of counsel as defined in *Strickland v. Washington*[3] and remand for a new trial.

## I.  *CRONIC AND STRICKLAND*

I agree with the majority's holding that *U.S. v. Cronic*[4] does not apply to the facts at bar. The presumptive prejudice to a defendant envisioned by *Cronic* is only present in very narrow circumstances: (1) when a defendant is denied counsel outright; (2) when counsel *completely* fails to subject the prosecution's case to adversarial testing; or (3) when the circumstances surrounding the case make the likelihood that any lawyer could provide effective assistance so small that a presumption of prejudice is appropriate, like the circumstances present in *Powell v. Alabama*, 287 U.S. 45 (1932).[5] None of these circumstances are present in this case.

However, I believe that under *Strickland,* Ferguson is entitled to a new trial.

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction...has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

---

[3] 467 U.S. 1267 (1984).

[4] 466 U.S. 648 (1984).

[5] *Cronic*, 466 U.S. at 659.

16

Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable.

Based on the following, I believe Ferguson's case meets both *Strickland* requirements.

## II. <u>DEFENSE ATTORNEY LEO MARCUM</u>

The majority credits several of Marcum's unsubstantiated claims about Ferguson's representation that are in direct contradiction to Ferguson's account. For example: Ferguson telling Marcum he intended to represent himself in the weeks before trial; that "[Marcum] and Ferguson *did* discuss obtaining an expert and that they both agreed it would not be beneficial"; and that Ferguson told Marcum he was certain he could "sway the female members of the jury panel in his favor." However, Marcum's storied history of professional misconduct should give the reader pause before accepting Marcum's version about his defense of Ferguson as gospel.[6]

---

[6] It is important to understand the circumstances surrounding the practices of attorney Marcum prior to his permanent disbarment in 2012. As this Court has previously noted, Marcum has extensive prior disciplinary issues, including: **(1)** Public reprimand on May 14, 1992, *Kentucky Bar Ass'n v. Leo Marcum*, 830 S.W.2d 389 (Ky. 1992), for violation of DR-9-101(b) which is the equivalent of SCR 3.130-1.11 (conflict in successive government and private employment); **(2)** Public reprimand on October 26, 2000, *Kentucky Bar Ass'n v. Leo Marcum*, 28 S.W.3d 861 (Ky. 2000), for violations of SCR 3.130-1.4(a) and (b) (communication); **(3)** Private Admonition on May 17, 2002, for violation of SCR 3.130-1.7(b) (conflict of interest); **(4)** Private Admonition on July 15, 2005, for violation of SCR 3.130-8.1(a) **(false statement in a disciplinary matter)**; **(5)** Amended and Substituted Private Admonition on February 23, 2005, for

## III. **THE COMMONWEALTH'S CASE**

Ferguson was tried for the murder of his nephew, Parker Ferguson. At trial, the Commonwealth asserted that Ferguson's motive for killing Parker was that Parker slept with Ferguson's wife Joy and was the father of Ferguson's daughter. A cabinet[7] worker testified about a motion Mrs. Ferguson filed requesting a paternity test in early July 2003 that alleged Ferguson was not the girl's biological father.

To support its theory of the case the Commonwealth presented the following evidence. On August 9, 2003, the night Parker died, police were

---

violation of SCR 3.130-1.2(a) (**failing to abide by a client's decision**), SCR 3.130-1.3 (**diligence**), SCR 3.130-1.16(d) (termination of representation), and SCR 3.130-8.1(b) (failing to respond to disciplinary authority); **(6)** Suspended from the practice of law on August 27, 2009, for 181 days, *Kentucky Bar Ass'n v. Leo Marcum,* 292 S.W.3d 317 (Ky. 2009), for violating SCR 3.130-1.15(a) (commingling) and SCR 3.130-8.[4](c) (**dishonesty, fraud, deceit, or misrepresentation**); **(7)** Suspended from the practice of law on April 22, 2010, for one year, *Kentucky Bar Ass'n v. Leo Marcum,* 308 S.W.3d 200 (Ky. 2010), for violations of SCR 3.130-1.1 (**competence**), SCR 3.130-1.3 (**diligence**), SCR 3.130-1.4(a) (communication), SCR 3.130-1.15(a) (commingling), SCR 3.130-1.15(b) (notifying clients of receipt of funds), SCR 3.130-3.2 (expediting litigation), SCR 3.130-8.1(b) (failure to respond to disciplinary authority), and SCR 3.130-8.[4](c) (**dishonesty, fraud, deceit, or misrepresentation**); **(8)** Suspended from the practice of law for three years on March 24, 2011, for three years, consecutive to any other suspensions, *Kentucky Bar Ass'n v. Leo Marcum,* 336 S.W.3d 95 (Ky. 2011), for violating SCR 3.130-1.15(a) (commingling) and SCR 3.130-8.1(a) (**false statement in a disciplinary matter**). *Kentucky Bar Ass'n v. Leo Marcum,* 377 S.W.3d 550, 551-52 (Ky. 2012). Marcum was ultimately disbarred following his conviction on six felony counts for failing to file Kentucky state income taxes between 2004 and 2009. *Id.* at 551.

Of particular note, Marcum's entry of appearance as counsel of record in Ferguson's case was filed in late August of 2003. The trial occurred in November of 2005. During that two-year time frame Marcum was involved in two other client representations that led to his one-year suspension from the practice of law as mentioned above for **failure to provide competent and diligent representation, failure to communicate properly with his client, and dishonesty.**

[7] Kentucky Cabinet for Health and Family Services.

18

called to Alger Ferguson's house. When the officers arrived, they found Parker's deceased body on the living room floor. Parker's body was directly in front of a blood-stained armchair. His chest was against the floor, with his hips turned upward so that the entire front of his body was not flush against the floor. Parker's head was turned so that the right side of his head was visible, and the left side was against the floor. Parker had a visible gunshot wound to his right temple, and, upon autopsy, a gunshot wound above the left side of his mouth was discovered. A significant amount of blood was pooled under his body and head. Blood was also pooled under a box fan lying on the floor front side up less than a foot away from Parker's head. A Browning Smith and Wesson (S&W) .40 caliber pistol was found next to Parker's right forearm.

It was undisputed that Parker and Ferguson were the only people at Ferguson's house that evening. They drank for several hours, and Parker's autopsy results showed that he had blood alcohol content of .176[8] and a presumptive presence of marijuana in his urine. The Commonwealth alleged that Parker and Ferguson were watching television in Ferguson's living room and speculated that they got into an argument about the paternity of Ferguson's daughter. Ferguson then walked to his hall closet with the remote control in his hand, put the remote down next to his .40 caliber S&W's case,

---

[8] The legal limit of blood alcohol content to operate a motor vehicle in Kentucky is .08. Kentucky Revised Statutes (KRS) 189A.010.

and got the gun out of its case. Ferguson then walked to the living room gun in hand. When Parker saw the gun he stood up, and Ferguson shot him in the face from at least eighteen to twenty-four inches away causing the entry wound above Parker's lip. Parker fell to the floor, and Ferguson walked up to Parker and shot him point blank in the temple while his head was on the floor.

Police officers arrived shortly after. When they asked Ferguson what happened, he told them Parker shot himself. Police investigated Parker's death as a suicide until the autopsy revealed that he had two entry wounds to his head: the one to his temple which the officers observed at the scene, and the other that entered above the left side of his mouth and lodged in the soft tissue of the left back of his neck. The second shot was not visible at the scene due to both Parker's mustache and the amount of blood pooled on the left side of his face. Following discovery of the second wound, the police investigated his death as a homicide. Ferguson was convicted and sentenced to a life sentence following a jury trial.

## IV.    **FERGUSON'S STORY**

After the Commonwealth concluded its evidence, Ferguson successfully moved the court to proceed *pro se,* and testified on his own behalf to the events of that day.

Ferguson said that he began drinking around ten or eleven o'clock in the morning. He spoke to Parker on the phone between two and three o'clock in the afternoon. Parker wanted to come over and drink with Ferguson, which

was something they did often. Parker got to Ferguson's house between four and four thirty, and they left shortly after to get more beer. On the way back they stopped to see Parker's mother (Ferguson's ex-sister-in-law) because it was her birthday.

Ferguson said he was unsure what time they got back to his house, but he remembers it still being daylight outside. He and Parker continued drinking and smoked marijuana. They went into the woods near Ferguson's house and went four-wheeling, shot beer cans, and continued to drink. When they got back to the house, they kept drinking and just sat around and talked; Ferguson said they often talked about life. Regarding Parker's death, Ferguson testified:

> And, I don't know what time it was, time got away from us. So I fell into a doze in the recliner in the corner of the house and Parker was over next to me. I was just laying there dozing, not quite fully asleep and I heard the gun (inaudible) back and the bullet eject.[9] And, there wasn't any need to do that (inaudible) about ten rounds in the clip and one in the barrel, but apparently he didn't know that when it's not reloaded. I woke up and said, "Parker what are you doing?" and he never said nothing. He just went like that and sat up and pulled the trigger and at that point I run out of the house through the door and on the porch. While I was running out I heard another shot and so I was laying on the porch and I wasn't sure what had happened whether he missed himself or just shot. It scared me. So I went back in and he's laying there and there's blood all over the place. He's laying on the side, as you seen in the pictures there with a hole in his head and I held his hand I know he wasn't alive, I checked for a pulse. And, I de-cocked the gun. And I believe at that point I

---

[9] There was an unspent round found at Parker's feet.

21

may have cocked it myself, I really don't remember. It's like I went into shock.

The Commonwealth pressed him on his version of the shooting on cross-examination:

Q: So for your version to have taken place, Parker would have shot himself in the lip from eighteen to twenty-four inches away, then fall to the floor and shot himself in the temple, then turned his arm around this way and (inaudible)?

A: No, that's not what happened. I said (inaudible) that he shot himself in the head and that's where the gun was pointed and then he fell to the ground and the gun went off.

Q: Was the gun underneath his body when you recovered it?

A: No.

Q: So you very clearly saw him shoot himself in the temple?

A: No, I said I seen him point it at his head.

Q: Point it at his temple, then you ran out. Do you recall the doctor and coroner presiding that this wound was immediately incapacitating? That once this shot was fired he could do no other voluntary thing?

A: I never said he did any voluntary acts. I said that the gun must have hit the floor and went off.

So, either Parker killed himself or Ferguson killed him. And, in the process, the gun may have dropped and accidentally discharged. The only way to at least come close to the truth of what happened was to have forensic experts fully analyze the evidence at the scene. But, as discussed in more detail below, Marcum did not consult with or hire any forensic experts to help Ferguson present a suicide defense. Further, he allowed the Commonwealth to present highly prejudicial forensic evidence by non-forensic experts and did not object to the testimony, or properly cross-examine the witnesses.

22

## V. MARCUM'S *STRICKLAND* DEFICIENT REPRESENTATION

### A. Pre-Trial

To begin, Marcum's overall approach to Ferguson's representation is disturbing. It is clear based on his testimony during Ferguson's RCr[10] 11.42 hearing that Marcum did not believe Ferguson's version of Parker's death. Marcum stated at the hearing that he did not want to present Ferguson's suicide defense because it appeared to him "to be a blatant lie."

By no means does a defense attorney have a duty to believe his client's story, but "[a]s advocate, a lawyer zealously **asserts the client's position** under the rules of the adversary system."[11] The purpose of having a defense attorney is to have at least one person in the court room on the defendant's side that is willing to present the defendant's version of what happened, and to subject the Commonwealth's evidence to proper challenge. A defense attorney is not relieved of this duty simply because he finds his client's story hard to believe.[12]

To aid in his RCr 11.42 appeal Ferguson hired Shelly Rice, an expert on crime scene reconstruction. Ms. Rice examined the physical evidence and the testimony regarding that evidence at trial. She compiled a 112-page report that discussed her conclusions about the evidence as well as the shortcomings

---

[10] Kentucky Rules of Criminal Procedure.

[11] Kentucky Supreme Court Rule 3.130, Kentucky Rules of Professional Conduct Rule 3.130(1.2) (emphasis added).

[12] *See McCoy v. Louisiana*, 138 S.Ct. 1500 (2018).

of the Commonwealth's case. Ms. Rice concluded that the evidence showed "that there was a greater probability that Parker Ferguson was the shooter." This demonstrates that if Marcum had fulfilled his duty to his client by, among other things, taking the time to consult and hire forensic experts, there is more than enough reason to believe that the outcome of Ferguson's trial would have been different. But Marcum did nothing to seek out an expert.

Further, Marcum was a privately retained attorney. Ferguson's story since the night Parker died was that he shot himself and he has never deviated from that story. Marcum knew from the instant Ferguson hired him that he wanted to present a suicide defense. If Marcum was unwilling to present that defense he should not have accepted the representation, or he should have withdrawn from it.[13] And the very fact that Marcum was a privately retained attorney makes it difficult to believe that he thought Ferguson intended to represent himself at trial. But even if he did, Marcum testified that Ferguson told him "[a] *couple of weeks* before trial...that he planned to represent himself at the trial." Marcum had *two years* to prepare for trial but did not. Roger Gibbs, an expert on criminal defense work,[14] testified at the 11.42 hearing that a defendant who claims a victim's death was the result of suicide has the burden of proving it. Therefore, he would have researched the issues,

---

[13] Kentucky Supreme Court Rule 3.130, Kentucky Rule of Professional Conduct Rule 3.130(1.16).

[14] Gibbs is the Eastern Regional Manager for the Department of Public Advocacy. He has thirty years of experience as an attorney, twenty-nine of which has been with the Department of Public Advocacy. He has tried over 100 cases and has assisted on others.

consulted an expert that would not necessarily testify, and if necessary, attempt to obtain expert witnesses to testify at trial. Marcum did none of these things. At the 11.42 hearing Marcum said, "what came out of [Ferguson's] mouth was going to be his defense."

Marcum also claimed that "he discussed obtaining funds for expert witnesses with [Ferguson], but [Ferguson] was unable to afford those funds." It is particularly alarming to hear this excuse, as a person's access to justice should never be limited by how much money he or she has.[15] Even so, if this was true, Marcum should have filed a motion for funding for an expert witness. Under KRS 31.110:

> (1) A needy person who is being detained by a law enforcement officer, on suspicion of having committed, or who is under formal charge of having committed, or is being detained under a conviction of, a serious crime...is entitled:
>> (b) [T]o be provided with the necessary services and facilities of representation, **including investigation and other preparation**.

(emphasis added). If the trial court denied this request, Ferguson could have asked the court to appoint counsel, and have his appointed counsel request Chapter 31 funding.[16] But, because Marcum did not even attempt to get this funding, Ferguson was denied the opportunity to have an expert testify on his behalf.

---

[15] *See e.g. Gideon v. Wainwright*, 372 U.S. 335 (1963); and *Anders v. State of Cal.*, 386 U.S. 738 (1967).

[16] Gibbs testified he was aware of cases where this occurred.

Next, the majority is correct that Marcum "was successful in having the court suppress certain evidence." He made successful motions to suppress any of Ferguson's prior bad acts, and any statements made to the police after he invoked his right to an attorney. He was also able to exclude any witness statements about Parker saying he would never commit suicide unless Marcum opened the door to that testimony. However, Marcum ultimately did open the door to that testimony on cross-examination. This allowed Parker's sister Valerie to testify that Parker said he would never commit suicide.

In that vein, after Ferguson successfully moved to proceed *pro se*, he called his sister Rosemary to testify. She testified Parker tried to kill himself in her presence several times in the past. While it is true that the jury did hear this testimony because Ferguson called her during his *pro se* representation, the first prong of a *Strickland* analysis asks whether counsel's performance was deficient. We know that Marcum never intended to call Rosemary as a witness even though she was a witness that could both bolster Ferguson's suicide defense and rebut Valerie's testimony that Parker said he would never kill himself. But Marcum did not know this because he did not bother to interview Rosemary during trial preparation.

## B. Motive

In addition to these pre-trial errors Marcum made several errors during trial, starting with his failure to subject the Commonwealth's theory of the motive to proper scrutiny. "Although motive is not an element of a criminal

26

prosecution, nevertheless, evidence of motive is relevant and admissible to prove conduct consistent with the motive, as well as willfulness or criminal intent."[17] Motive is therefore important for a jury to consider in a criminal trial, particularly when the alleged crime is murder, an intent crime.[18]

In this case, it would have been simple for Marcum to try to create reasonable doubt about the alleged motive. First, the motion Mrs. Ferguson filed did not allege Parker was the father of her child, it merely stated that Ferguson was not. Marcum did not point this out during the cabinet worker's cross-examination. In fact, the only thing he asked her was whether it was a "common ploy for women to say that their husband is not the father of their child when there is a custody battle." More significantly, Detective Paul Cales, the lead detective in Ferguson's case, filed a report which was provided to Marcum in December 2003, nearly two full years before the trial. The report stated: "I also advised her of the baby comments. Joy advised her baby does not belong to [Ferguson] or Parker." Joy was not a witness for the Commonwealth, and Marcum never intended to call her. However, Det. Cales was a witness for the Commonwealth, and Marcum did not solicit this critical piece of information from Det. Cales on cross-examination.

---

[17] *McGuire v. Commonwealth*, 368 S.W.3d 100, 110–11 (Ky. 2012).

[18] "(1) A person is guilty of murder when: (a) With intent to cause the death of another person, he causes the death of such person[.]" KRS 507.020.

## C. <u>Gunshot wounds</u>

Dr. Rolston, the medical examiner who performed Parker's autopsy, testified for the Commonwealth. Regarding the gunshot wound to Parker's face, Dr. Rolston provided the following testimony:

> **A:** Multiple things exit the gun when it's fired. The bullet is the most notable. Other things that come out are unburnt pieces of gun powder, which I refer to as stippling. Additionally soot, which is the product of combustion, exits the barrel of the gun as well as various gases, including carbon monoxide.
>
> **Q:** Those soot and stippling products, do they travel very far?
>
> **A:** They travel...**stippling**, for instance, **is in general for most handguns travel about eighteen to twenty-four inches**.
>
> **Q:** Did you notice stippling around the wound to the lip?
>
> **A:** No, there was no stippling noted.
>
> **Q:** What conclusion can you reach within a reasonable degree to medical certainty as to the absence of that?
>
> **A:** It means that there's no indication on the body, the skin surface, that the gun was within eighteen to twenty-four inches when it was fired.
>
> **Q:** So in all likelihood it was farther away. Is that what you're saying?
>
> **A:** That's what I'm saying.

(emphasis added).

This is the testimony the majority references when it states that "the shot above Parker's lip was taken from a distance of at least 18-24 inches away."

This testimony was the only evidence that supported the crucial conclusion that the shot to Parker's face had to be fired from eighteen to twenty-four inches away. No testing was performed on the firearm and ammunition in this

case to determine exactly what distance stippling would occur from it being fired.

> Ms. Rice's report stated the following regarding stippling:

>> Stippling or tattooing is caused by particles of unburned gunpowder that creates punctate abrasions or burns when it contacts the surface and cannot be washed away. As there have been general predicted distances of this evidence [in this case], it is still not an accurate assessment of this evidence. **The distance and presence of stippling/tattooing is variable to the type of firearm and ammunition. A distance determination test would be required using the same firearm and same lot number of ammunition to conclude the actual distances that stippling would be present.**

(emphasis added).

Marcum did not cross Dr. Rolston on the fact that no tests were performed with the specific gun and ammunition used in Parker's shooting to get accurate results on the distances from which stippling would and would not occur. Nor did he highlight the fact that Dr. Rolston made a very specific conclusion about the distance in this case based on a very generalized statement about when stippling occurs "for most handguns." If Marcum would have hired an expert or experts, they could have both conducted a stippling test on the specific gun and ammunition used in the shooting and pointed out any inaccuracies of the medical examiner's testimony.

Ms. Rice also found that the shot to Parker's temple was particularly important because: (1) the exit wound does not demonstrate that Parker's head

29

was pressed against a hard surface, i.e. the floor, when the shot was fired[19]; and (2) no bullet fragments were lodged in the floor, even though Dr. Rolston testified they should have been there if Parker was shot in the position documented by the photographs. These are critical facts that the jury should have been aware of while deliberating.

## D. **Blood Spatter**

"If the subject matter of an issue in litigation is not common knowledge, then expert testimony is proper."[20] The forensic analysis of blood spatter is certainly not within the realm of common knowledge. Nonetheless, the Commonwealth's primary witness about the blood spatter at the scene was Det. Cales, who had investigated less than ten homicides during his time as a detective with the Kentucky State Police and did not have any education or training in the area of blood spatter analysis. He testified at length about what the shape and location of blood spatter at the scene of Parker's death, and his conclusions about the blood spatter in this case:

> **Q:** All right. Now, had those spatters come about from a self-inflicted gunshot wound in the chair, what shape would you have expected those droplets to be?
>
> **A:** If the spatter came from the direction of the chair, I would have expected the spatter to have...to be more oval shape. When I say oval, kind of like that and

---

[19] If Parker's left temple was compressed against a hard surface at the time the fragment exited, the wound should have had a shored appearance. Instead, the exit wound was cone shaped and protruded about two inches.

[20] *Baptist Healthcare Sys. v. Miller*, 177 S.W.3d 676, 680 (Ky. 2005).

that would point me to the direction that it came from but these were not like that.

**Q:** These were round?

**A:** Yes, sir.

**Q:** Were you able to draw a conclusion from the shape of those droplets as to where Parker Ferguson had been when that shot happened?

**A:** When that shot happened, it's my conclusion that he was directly underneath that part of the ceiling.

**Q:** On the floor?

**A:** Yes, sir.

[...]

**Q:** Did you notice any other blood spatters?

**A:** Across from the chair on the opposite side of the room there was a blood spatter. I found one spatter against the wall that was in such a position that if you're sitting in the chair that has the blood on it, you cannot see the spatter. If you stand up you can see it. This looked like a direct on spatter, which means I don't think it did appear that the spatter came out and dropped down like this but it hit the wall directly. I believe that the time that that spatter was made that Mr. Ferguson...Parker Ferguson was standing at that time.

Det. Cales' testimony was the only testimony that supported the Commonwealth's theory that Parker was standing when he was shot above the lip and was lying on the floor when he was shot in the temple. In fact, the only other witness for the Commonwealth who analyzed the blood evidence provided some testimony that supported Ferguson's story. Detective Keith Moore testified:

31

**A:** This photograph depicts an area of the bloodstain that is on the chair and also on the decedent. This is a flow pattern that is **obviously consistent with the decedent sitting in the chair**.

(emphasis added). Det. Cales also testified that he could not say with certainty how the wound to Parker's lip was acquired. Yet Marcum did not address the fact that this testimony was much more consistent with Ferguson's defense than the Commonwealth's theory, and did not object to the fact that Det. Cales was not an expert in blood spatter analysis.

Ms. Rice's report discussed the blood stain evidence at length. She noted that Det. Cales made references to bloodstain patterns without properly identifying the bloodstains or using proper terminology and disregarded several significant bloodstains at the scene. She also disagreed with Det. Moore's conclusion that Parker did not shoot himself in the temple because there was no shift in the blood flow pattern after the wound was inflicted. She found this to be incorrect because under the main flow of blood from the temple wound is an initial downward blood flow that is more indicative of Parker being in an upright position when the temple wound occurred, then falling over.

She also made the following conclusions based on her independent analysis of the evidence:

1) Parker was sitting upright in the armchair he was found in front of. This conclusion was based on the impact stains dispersed over the top portion of Parker's jeans.

2) **No one observed blood on Ferguson's person while at the scene.** If Ferguson inflicted Parker's contact head wound, evidence of that would likely be found on his person.

32

3) The marks on Parker's outer hand were consistent with either abrasions from gunpowder or back spatter from a self-inflicted gunshot wound. These marks were not addressed by the coroner or police.

4) There was a void in Parker's right palm where no blood was found. The Commonwealth asserted this void was created by him holding the beer can found near his body. However, the shape of the void is more consistent with the handle of the gun.

5) If Parker had in fact been lying on the ground when he sustained the wound to his temple, the impact stains on the right side of his face would be more prevalent than they were because the back spatter would have fallen on his face as it dispersed from the injury.

6) No measurement was taken of the distance from the floor to the ceiling. This measurement is vital to determine whether the bloodstains could have travelled that distance if Parker was shot while lying in the position he was found in, which was the Commonwealth's theory. Typically, smaller blood stains of back spatter from a high velocity impact do not have enough energy to travel far.

7) No measurements or overall photographs were taken of the location of the bloodstains on the opposite wall. Therefore, no determination can be made about their actual location.

8) It is possible that the blood on the ceiling and the opposite wall got there because of the box fan found near Parker's body. Ferguson said the fan was on the entire night, and he is unsure when it was turned off or knocked over. Ms. Rice speculates that (1) the blood particles were forced onto the opposite wall by the fan blowing while it was upright after the shots were fired and (2) the blood pooled under Parker's body was sucked up into the fan after it was knocked over and sprayed onto the ceiling.

Again, if a qualified expert like Ms. Rice came to these conclusions, it is reasonable to conclude that if Marcum had taken the time to consult and hire experts, they may have come to the same or similar conclusions, and at the very least would have been able to point out the shortcomings in the Commonwealth's evidence.

33

## E. Firearm Evidence

The only evidence the Commonwealth presented about the gun in this case came from Det. Cales and Det. Moore. Neither are firearms experts. Both said essentially the same thing: based on the type of gun found at the scene, the hammer of the gun should have been found in the cocked position. But instead the hammer was found in the de-cocked position. The implication of course being that Parker could not have de-docked the hammer because he died instantly after he sustained the shot to his temple. But this was really much ado about nothing. Ferguson later testified unequivocally that he de-cocked the hammer after he came back into the house. Regardless, Marcum never objected to any of their testimony about the gun and its functioning even though neither of them were firearms experts.

More significantly, Marcum never prepared any evidence to present Ferguson's version of events: after Parker shot himself in the temple, both he and the gun dropped to the floor, and the second shot to his lip occurred when the gun hit the floor and fired. Included in Ms. Rice's report is a copy of an owner's manual for a Browning S&W .40 caliber. In the safety section of the manual it says: "DROPPING YOUR HI-POWER PISTOL WHEN LOADED CAN CAUSE AN ACCIDENTAL DISCHARGE EVEN WITH THE HAMMER IN THE DROPPED POSITION. Be extremely careful while hunting or during any shooting activity to avoid dropping any firearm." So clearly, there was independent evidence from the manufacturer to support Ferguson's contention that the gun fired when it hit the floor, but the jury never saw or heard about

34

the warning in the manual. Instead, Marcum only asked Det. Moore whether a firearm can sometimes fire when it is dropped. Det. Moore said he believed they could, but that he "could not say with certainty" whether the gun in this case could because he is "not a firearms examiner."

## VI.    CONCLUSION

To be clear, our review is not about whether Ferguson is innocent or guilty. It is about whether he received the effective assistance of counsel that every criminal defendant is entitled to under *Strickland.*

Under the first prong of *Strickland* we ask whether Marcum's performance was deficient: whether he made errors so serious that he was not functioning as the "counsel" guaranteed to Ferguson by the Sixth Amendment. As discussed *supra,* Marcum never believed in Ferguson's defense and refused to do anything meaningful to prepare for trial. Because of this, he could not and did not subject the Commonwealth's evidence to a proper challenge. Marcum also allowed non-experts in the fields of blood spatter and firearms to present the only evidence on those topics, that directly supported the Commonwealth's theory without objecting to the testimony.

The second prong of *Strickland* requires showing that Marcum's deficient performance prejudiced the defense: that Marcum's errors were so serious that they deprived Ferguson of a trial whose result is reliable. If Marcum would have made the proper objections to the Commonwealth's witnesses, more vigorously cross-examined the Commonwealth's evidence, consulted and hired experts that could have testified to the shortcomings in the Commonwealth's

35

evidence and present evidence that Parker shot himself, it could have created reasonable doubt in the minds of one or more jurors. In other words, there was valid admissible evidence out there that jury never got to hear. This, by definition, renders the result of Ferguson's trial unreliable, thereby meeting the second *Strickland* prong.

I would therefore affirm the Court of Appeals insofar as it granted Ferguson a new trial and remand for a new trial under *Strickland*.

COUNSEL FOR APPELLANT/CROSS-APPELLEE:

Andy Beshear
Attorney General of Kentucky

Gregory C. Fuchs
Assistant Attorney General

COUNSEL FOR APPELLEE/CROSS-APPELLANT:

Samuel N. Potter
Assistant Public Advocate

Rachel Abigail Vinales
Assistant Public Advocate