RENDERED:  OCTOBER 16, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-1422-MR

PAUL ESTES                                                          APPELLANT

v.
APPEAL FROM MERCER CIRCUIT COURT
HONORABLE DARREN W. PECKLER, JUDGE
ACTION NO. 09-CR-00079

COMMONWEALTH OF KENTUCKY                              APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, JONES, AND L. THOMPSON, JUDGES.

JONES, JUDGE:  The Appellant, Paul Estes, appeals from the Mercer Circuit

Court's order summarily denying his RCr[1] 11.42 motion without an evidentiary

hearing, as well as the lower court's order denying Estes's motion to recuse the

---

[1] Kentucky Rules of Criminal Procedure.

circuit judge assigned to this matter. Having reviewed the record and being otherwise sufficiently advised, we affirm.

## I. BACKGROUND

The factual background and relevant trial testimony were summarized by the Kentucky Supreme Court as part of its direct review of Estes's judgment of conviction and sentence. We adopt the Court's summary as set forth below:

> [Estes] and Megan Brooks began dating in January 2009. Megan and her young daughter lived with Megan's mother, Debbie Brooks. [Estes] stayed there at times. According to [Estes], Megan had an appetite for crack cocaine and methamphetamine and she introduced him to crack. At 3:53 a.m. on July 20, 2009, Megan called 911 to report that Debbie was dead. Police arriving at the scene found Debbie's body on her bedroom floor with a plastic grocery bag around her head.
>
> The bedroom scene suggested that a struggle had occurred. The autopsy revealed bruises on the victim's hand, leg, knees, neck, shoulders, and inside of the scalp. Scrapes were found on the side of her nose and on her knee. DNA collected from beneath the victim's fingernails implicated [Estes].
>
> [Estes] was arrested and charged with Debbie's murder. Prior to his indictment and with his attorney present, [Estes] confessed his involvement in the murder to police. An audio recording of his statement related the following events.
>
> The recording revealed that [Estes] told police that on the night of Debbie's death, he and Megan smoked marijuana and a large quantity of crack cocaine. When Megan's "high" began to subside, she told [Estes] that

-2-

she wanted to start a life together with him, but they needed money that could be obtained from an insurance policy on her mother's life. For an hour, she coaxed [Estes] to kill Debbie, and he was finally persuaded to do so. [Estes] said he was not offered any money to kill Debbie. His only inducement was Megan's assurance that he, Megan, and Megan's daughter could have a life together as a family if he killed Megan's mother. At Megan's insistence, they entered the bedroom where Debbie was sleeping. [Estes] put a pillow over Debbie's face and held it there. Debbie awakened and scuffled with [Estes] to break free. [Estes] said he held the pillow to her face until she lost consciousness and he believed she was dead. With Debbie lying on the floor, [Estes] admitted that he asked Megan to verify that she was dead. Megan did so by placing a plastic bag tightly over Debbie's head. Megan then directed [Estes] to leave the scene. She later threatened to have [Estes] killed if he talked to the police. Over [Estes's] objection, his audiotaped statement was played for the jury.

The medical examiner's testimony confirmed that Debbie had suffocated, but it could not be determined if death was caused by a pillow held over her face or the plastic bag found over her head. A fingerprint analyst testified that six of the eight fingerprints found on the bag matched [Estes]. Megan was excluded as a source of the fingerprints. A biologist testified that the DNA taken from Debbie's fingernails matched [Estes]; no conclusions could be drawn from DNA from the bag.

[Estes] called Megan as a witness during his case in chief. She testified that she entered an *Alford* plea to second degree manslaughter in connection with her mother's death. She said that on the night of the murder she was out with a friend using cocaine. She returned home around 3:30 a.m., checked on her daughter, and then went to sleep on the couch. At 4:00 a.m., she heard Debbie's alarm clock. She went to Debbie's bedroom, saw Debbie lying on the floor, and called 911.

-3-

Megan claimed that she had a good relationship with her mother and that she did not need her mother's money because she had her own income from selling drugs. Megan's testimony was impeached by several prior inconsistent statements. Three of Megan's former cellmates testified that Megan had made statements consistent with [Estes's] account of the murder.

The jury convicted [Estes] of murder and recommended a sentence of life without benefit of parole for 25 years. Judgment was entered accordingly.

*Estes v. Commonwealth*, No. 2014-SC-000320-MR, 2016 WL 2605269, at *1-2 (Ky. May 5, 2016).

As related to the instant appeal, the critical events took place within days of Estes's arrest and confession to police. Early on, police suspected Estes and Megan were involved in Debbie's death. Police were able to arrest the two on preexisting, unrelated criminal charges. Estes was placed in the Boyle County Detention Center on those charges. From the onset, Estes's behavior concerned jail staff. They were afraid Estes might try to harm himself. He was placed on suicide watch, and jail staff requested a psychological consultation. Comp Care performed the evaluation and recommended Estes be sent to Eastern State Hospital where he could be observed more closely. Estes was not sent to Eastern State Hospital, but he was prescribed antidepressants while at the jail.

In the days leading up to Estes's statement, he told the lead detective on the case, Gary Bradshaw, that he wanted to talk. Detective Bradshaw was

concerned that Estes had not yet been appointed counsel in connection with the murder charge and decided to wait until Estes had counsel to speak with him. On August 10, 2009, a public defender from the Department of Public Advocacy ("DPA"), Susanne McCollough, was appointed to represent Estes. Attorney McCollough was the most experienced attorney at the local DPA office and was its supervising attorney at the time.

After the appointment, Detective Bradshaw called Attorney McCollough. He told her that Estes wanted to talk to him about Debbie's murder. He advised Attorney McCollough that he already had very strong evidence implicating Estes in Debbie's murder, including Megan's statement that Estes acted alone, evidence indicating Estes's actions were motivated by a desire to kill Debbie for life insurance money, Estes's DNA under Debbie's fingernails, and a statement from a friend of Estes that Estes indicated involvement in the murder.

After speaking with Detective Bradshaw, Attorney McCollough confirmed her appointment and performed some legal research to determine whether the charges against Estes made him eligible for the death penalty. Attorney McCollough believed that Estes could be facing the death penalty because one of the aggravating factors for the death penalty is that "[t]he offender committed the offense of murder for himself or another, for the purpose of

receiving money or any other thing of monetary value, or for other profit[,]" KRS[2] 532.025(2)(a)4, and the Commonwealth indicated it had evidence that Estes was motivated by proceeds from a life insurance policy.

Next, Attorney McCollough called the Mercer County Commonwealth's Attorney, Richie Bottoms. During their conversation, Prosecutor Bottoms agreed not to seek the death penalty if Estes gave a statement. Prosecutor Bottoms also indicated that *if* Megan set it up, then Estes would be the "low man on the totem pole." The Commonwealth denied this statement was tantamount to an agreement that Estes would receive a lower sentence than Megan. Attorney McCollough could not recall her exact conversations with Prosecutor Bottoms in this regard, and her notes are not clear.

Attorney McCollough then met with Estes at the Boyle County Detention Center. Attorney McCollough was not aware of the Comp Care evaluation. Estes testified that he was in a "turtle gown," which he argues should have been sufficient to place Attorney McCollough on notice of his precarious mental state.[3] Attorney McCollough testified that she does not believe Estes was in a turtle gown at their first meeting, although she recalls him wearing one at later

---

[2] Kentucky Revised Statutes.

[3] A "turtle gown/suit" is a tear-resistant single-piece outer garment that is generally used to prevent a hospitalized, incarcerated, or otherwise detained individual from forming a noose with the garment to commit suicide.

meetings. Attorney McCollough, while not a medical expert, has extensive experience dealing with clients in mental crisis and was well-aware of the law as it relates to the need to have a client in a questionable mental state evaluated prior to allowing the client to speak to investigators. She did not find anything about Estes's conduct indicative of his being incompetent or otherwise unable to understand his rights. Attorney McCollough does not specifically recall whether she told Estes not to speak with law enforcement; however, she is 99.9% sure that she would have advised him not to do so as that is her general practice, especially in cases as serious as Estes's case.

Attorney McCollough recalls that Estes wanted to talk to law enforcement primarily because he was afraid Megan was going to get out of jail and would harm his family. She also believed he wanted to get right with God and express his remorse. For her part, Attorney McCollough was anxious to remove the possibility of the death sentence. Attorney McCollough went over Estes's statement with him in detail.

Later that afternoon, Attorney McCollough and Estes met with Detective Bradshaw. The conversation was recorded. Before asking any substantive questions, Detective Bradshaw read Estes his *Miranda*[4] rights. Estes stated that he understood his rights and acknowledged that his counsel was present.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

He then recounted the events leading up to the victim's death.[5]  After Estes

finished recounting his version of the events, Attorney McCollough made the

following statement:

> Aw I'd like to, I'd like to put on the record of, for [Estes]
> that um, he's not been offered any kind of deal at this
> time um he so I don't want anybody to think he's doing
> this because he's been offered x amount of years or
> something, um, he's taking responsibility but he doesn't
> want, he wants the truth out and uh and will rest easier.

Record (R.) at 165.  Attorney McCollough made this statement partially to protect

herself so that it would be clear that Estes had decided to talk to the detectives of

his own volition.

Detective Bradshaw then asked Estes if anyone coerced him into

making his statement.  Estes replied that no one had coerced him or made any

threats or promises to him, and that he had made the statement of his own free will

---

[5] He stated that Megan introduced him to crack and that he soon found himself addicted to it. Estes eventually began staying with Megan and the victim.  On the evening the victim was killed, Estes and Megan were at home where they smoked a large amount of crack and some marijuana.  Estes said as Megan was coming down from her high she began to talk about needing to find a way to get more money.  Eventually, Megan began talking about killing the victim for insurance money.  Estes said she continued to suggest that he kill the victim for over an hour or so until Estes finally agreed to do it.  At that point, Estes retrieved a pillow and the two then went upstairs.  As they stood upstairs, Megan urged Estes to complete the act.  After about twenty minutes, Estes entered the victim's room.  He found her on her bed asleep.  He placed a pillow over her face.  She struggled and the two ended up on the floor.  He continued applying pressure to the pillow until he believed she was dead.  Estes asked Megan to check to see if the victim was dead.  Megan put the victim's head in a yellow, plastic Dollar General Store bag.  Megan then told Estes to leave the premises.  Estes left Megan with the victim and drove to Lexington where he continued smoking crack cocaine.  Estes said that after the victim's funeral, Megan threatened to have him harmed if he told anyone what they had done.  He said that he became particularly scared after he caught Megan cheating on him with another man.

-8-

after having discussed the matter with Attorney McCollough. Estes now says that Attorney McCollough coached him into saying "no" by giving him non-verbal cues during the interview.

Approximately two months after Estes made his statement, Attorney McCollough moved the trial court for an order directing a mental examination of Estes to determine whether he was competent to stand trial, as well as his criminal responsibility at the time of Debbie's murder. R. at 16. In support of her motion, defense counsel noted that Estes may have been under the influence of intoxicants at the time of the alleged offense and that Estes had been on suicide watch at the Boyle County Detention Center for some time. The trial court granted the order, and Estes was admitted to the Kentucky Psychiatric Correctional Center (KCPC) on October 20, 2009, where he remained until November 19, 2009.

Dr. Amy J. Trivette was assigned to be Estes's evaluator. Dr. Trivette reported back to the trial court by letter dated November 27, 2009. Dr. Trivette indicated that, as requested, she evaluated Estes for competency to stand trial and criminal responsibility. Dr. Trivette noted prior to his arrival at KCPC, Estes had been housed at the Boyle County Detention Center where he was placed on suicide watch after verbal threats of self-injury. Upon his arrival at KCPC, Estes was taking Paxil and Vistaril. She found Estes to be pleasant, forthcoming, and cooperative. Upon admission, he reported feeling fine but somewhat over-

sedated by his medication regime. He denied particular problems with mood, sleep, or appetite. He denied any active suicidal ideation. He provided vague descriptions of visual and auditory hallucinations since childhood. However, he was not responding to internal stimuli and displayed no evidence of a thought disorder. He did not express delusional beliefs. Dr. Trivette adjusted Estes's medications slightly.

Dr. Trivette ultimately concluded that Estes was competent to stand trial and that there was no evidence of mental illness or mental retardation that would have impaired Estes's capacity to appreciate the criminality of his conduct or the ability to conform his conduct to the requirements of the law at the time of the alleged incident. Following his return to the Boyle County Detention Center, the trial court found Estes competent to stand trial and criminally responsible.

The case proceeded with several continuances. Shortly before trial was scheduled to begin in August of 2013, Estes filed a handwritten, *pro se* "motion for conflict of counsel and to suppress statements to detectives." Estes stated that he filed the motion after Attorney McCollough's supervising attorney, Teresa Whittaker, visited him in jail. Supervisor Whittaker advised Estes that he

may have received ineffective assistance of counsel when Attorney McCollough allowed him to give his statement to Detective Bradshaw.[6]

In response to Estes's motion, the trial court set a hearing for August 15, 2013, and directed the DPA to appoint independent counsel to represent Estes at the hearing. In response to the order, Rebecca L. Lytle was appointed to represent Estes. Attorney McCollough, Estes, and Detective Bradshaw testified at the hearing. Following the hearing, the trial court entered a lengthy order denying Estes's motion to suppress his statement.

> [Estes's] attorney testified that she had counseled [Estes] not to make a statement but that he was determined to do so for various reasons. Counsel had advised [Estes] that his truthful statement would remove the possibility of the death penalty being sought by the Commonwealth. Counsel also testified that [Estes] expressed a desire to "get right with God" as well as a desire to protect his family from harm should his co-defendant [Megan Brooks] be released. Counsel further testified that prior to the statement being given, she had <u>not</u> received any specific sentence recommendation or promise from the

---

[6] A little over three years after Estes gave his statement to Detective Bradshaw, our Court rendered an Opinion in a somewhat factually similar case, *McGorman v. Commonwealth*, No. 2010-CA-001971-MR, 2012 WL 5626893 (Ky. App. Nov. 16, 2012) (not to be published), aff'd in part, rev'd in part *sub nom. Commonwealth v. McGorman*, 489 S.W.3d 731 (Ky. 2016). We held that McGorman's trial counsel was ineffective where counsel allowed McGorman to be interviewed by police without having time to perform an independent investigation and without having first investigated McGorman's mental health. Even though *McGorman* was not final, Supervisor Whittaker met with Estes without Attorney McCollough present and explained the holding in *McGorman.* Supervisor Whittaker told Estes she believed Attorney McCollough's actions were ineffective pursuant to *McGorman.* She recommended various courses of action to Estes, one of which included filing the *pro se* motion. Ultimately, the Kentucky Supreme Court reversed our holding regarding counsel's ineffectiveness in allowing McGorman to give a statement to police, but the Court's Opinion was not rendered until some time after the events at issue in this case had transpired.

Commonwealth. It should be noted that the Commonwealth's intended sentence for Megan Brooks at the time of the statement was life without parole. [Estes's] testimony differed from that of his lead counsel. He indicated he would not have given the statement had his attorney advised against same nor would he have made any statements to the news media. He further indicated he was following the non-verbal recommendation of his attorney during the taking of the statement but was under the belief that he would get less than his co-defendant due to his cooperation. He states then that his answers to the detective's questions about voluntariness were false due to the "tutoring" of his counsel. This testimony was contradicted by [Estes's] trial counsel.

The detective who was present at the taking of the statement testified that he maintained relatively constant eye contact with [Estes] during the statement. He noted that [Estes] seemed to pay very little attention to his attorney except when she spoke. He also noted that the room was very small (approximately 10' x 10') and that he did not notice any overt non-verbal communication by [Estes's] attorney.

Based on the foregoing, this Court is convinced that [Estes's] statement was not at the time, precipitated by any promise to receive a lesser sentence than his co-defendant. Rather, the statement was meant to incriminate Megan Brooks, his co-defendant, and to relieve his own conscious [sic] and remove the death penalty from being a possible sentence. Although [Estes] now contends that a death sentence was not an important factor in his consideration, it was a significant consideration for the Commonwealth to surrender. It also appears to have been the only concession the Commonwealth had agreed to make in return for a full and truthful statement by [Estes].

-12-

> [Estes's] motion to suppress his statement is denied. The lead counsel, Ms. McCollough reluctantly and voluntarily requested to be relieved as trial counsel; said request was sustained due to ethical considerations in light of the testimony she was compelled to present in Court.

R. at 181-83.

Estes's case proceeded to trial in April of 2014, with Attorney Lytle representing Estes. The jury convicted Estes of murder and recommended a sentence of life without benefit of parole for 25 years. Judgment was entered accordingly. Estes appealed his judgment of conviction and sentence to the Kentucky Supreme Court. Among other issues, Estes argued that the trial court erred when it refused to suppress his recorded August 2009 statement to Detective Bradshaw. With respect to this issue, the Court held that the trial court did not err when it declined to suppress Estes's recorded statement to Detective Bradshaw; however, the Court expressed no opinion on the effectiveness of Attorney McCollough in allowing Estes to give the statement. *Estes*, 2016 WL 2605269, at *8.

After the Kentucky Supreme Court affirmed Estes's judgment of conviction and sentence, Estes filed an RCr 11.42 motion to alter, amend, or vacate his judgment of conviction and sentence with the trial court. Estes alleged he received ineffective assistance of counsel when Attorney McCollough failed to fully investigate the facts of the case and Estes's mental state prior to agreeing to

-13-

allow Estes to be interviewed by Detective Bradshaw, and she compounded this error by actively participating in the interview and providing incriminating information in the form of her questions and prodding of Estes. Estes also filed a motion requesting the trial court judge, Hon. Darren W. Peckler, to recuse himself from any further proceedings. Estes asserted that Judge Peckler's actions and correspondence with DPA regarding Attorney McCollough and Supervisor Whitaker showed that he had predetermined the effectiveness of Attorney McCollough's representation and that he had additionally engaged in *ex parte* communications with Attorney McCollough over the issue.[7] The trial court denied the motion to recuse Judge Peckler, as well as Estes's RCr 11.42 motion.[8]

This appeal followed.

---

[7] Specifically, Estes cited the fact that Judge Peckler reported Supervisor Whittaker to the Kentucky Bar Association and sent two letters to DPA's general counsel, Scott West, about Supervisor Whittaker's actions. In one of the letters, dated September 3, 2013, Judge Peckler chastised Mr. West for not contacting Attorney McCollough before reaching a decision that Supervisor Whittaker did not engage in improper conduct. Estes contended that Judge Peckler could not have known whether DPA's investigation into the matter included speaking with Attorney McCollough unless the court had engaged in *ex parte* communications with Attorney McCollough about the matter.

[8] Estes also moved the trial court to recuse the Mercer County Commonwealth Attorney's Office from any further work on Estes's criminal case. Estes relied on the fact that Attorney McCollough had since become employed by the Mercer County Commonwealth Attorney's Office. The trial court also denied this motion, a decision Estes has not appealed.

## II. ANALYSIS

### A. *Evidentiary Hearing*

The trial court decided Estes's RCr 11.42 motion without holding an evidentiary hearing. The trial court indicated that it opted not to hold an evidentiary hearing because the record was clear insomuch as the arguments presented in Estes's RCr 11.42 motion mirrored those of the suppression hearing, and the evidence and testimony of that hearing were on the record.

"Deciding a motion for relief from a judgment under [RCr] 11.42 for ineffective assistance of trial counsel requires the trial court to conduct an evidentiary hearing only when there is 'a material issue of fact that cannot be determined on the face of the record.'" *Commonwealth v. Searight*, 423 S.W.3d 226, 228 (Ky. 2014) (quoting *Wilson v. Commonwealth*, 975 S.W.2d 901, 904 (Ky. 1998)). "This Court has consistently held that a hearing is not necessary when a trial court can resolve issues on the basis of the record or when 'it determine[s] that the allegations, even if true, would not be sufficient to invalidate [the] convictions.'" *Id.* (quoting *Wilson*, 975 S.W.2d at 904); *see also Newsome v. Commonwealth*, 456 S.W.2d 686, 687 (Ky. 1970).

The record in this case was extraordinarily well-developed. Attorney McCollough, Detective Bradshaw, and Estes testified at the prior hearing. Attorney McCollough's notes were introduced into the record. Additionally, the

-15-

record contains a substantial amount of information about Estes's mental state. Given the information contained in the record, we cannot see how another evidentiary hearing would have added anything of substance to the record. Accordingly, we find no error with respect to the trial court's decision to rule on Estes's RCr 11.42 motion without first conducting an evidentiary hearing.

### B. Ineffective Assistance of Counsel Claims

Claims for ineffective assistance of counsel are evaluated under the two-part test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by our Supreme Court in *Gall v. Commonwealth*, 702 S.W.2d 37 (Ky. 1985). A successful appellant must first show "that counsel's performance was deficient." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. "This is done by showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment or that counsel's representation fell below an objective standard of reasonableness." *Parrish v. Commonwealth*, 272 S.W.3d 161, 168 (Ky. 2008) (quoting *Strickland*, 466 U.S. at 687-88, 104 S.Ct. at 2064) (internal quotation marks omitted). When applying this test, our "scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.*

The appellant must next show that the deficient performance was prejudicial to his defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* To show prejudice, the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is the probability sufficient to undermine the confidence in the outcome." *Bowling v. Commonwealth*, 80 S.W.3d 405, 410 (Ky. 2002) (citation omitted).

Estes's first argument is that Attorney McCollough rendered ineffective assistance of counsel when she failed to conduct a substantive investigation or make a reasonable decision that particular investigations were unnecessary before arranging for him to provide his statement to Detective Bradshaw. We disagree.

The level of investigation required necessarily must depend on the stage of the case as related to counsel's strategic goals for that particular stage. In this case, Attorney McCollough testified that she was gravely concerned that Estes would be facing a possible death sentence if convicted. She was eager to secure an agreement from the Commonwealth that it would not seek the death penalty against Estes. She was also aware that Estes wanted to talk to law enforcement about the circumstances surrounding Debbie's death and would likely

-17-

insist on doing so with or without an agreement. Attorney McCollough's testimony shows that allowing the interview was strategic in nature and undertaken so as to gain some benefit for Estes.

Additionally, Attorney McCollough did investigate the case before allowing Estes to meet with Detective Bradshaw. Attorney McCollough testified that she spoke to Detective Bradshaw about the Commonwealth's case against Estes. During this conversation, she learned the Commonwealth had already accumulated a substantial amount of evidence implicating Estes in Debbie's death, including Estes's DNA under Debbie's fingernails. Attorney McCollough then determined that because the motivation was alleged to be life insurance proceeds, the Commonwealth could seek the death penalty. *See* KRS 532.025(2)(a)4. Next, Attorney McCollough called Prosecutor Bottoms. It is undisputed that during their conversation, Prosecutor Bottoms agreed not to pursue the death penalty if Estes gave a statement implicating Megan in the crime.[9] Finally, Attorney McCollough met with Estes in person at the jail. Estes told her his version of the events and indicated to her that he wanted to talk to police to make sure they knew Megan was involved so that she would not be released, as he was gravely concerned that

---

[9] They also discussed that if it turned out that Megan "set up" the murder, Estes would be "low man on the totem pole." Attorney McCollough believes that this statement meant that Estes would be offered a lower sentence than Megan. However, it is unclear whether an agreement was actually reached on this point. Attorney McCollough could not recall the exact conversation and her notes are unclear. Prosecutor Bottoms has steadfastly denied any such agreement.

-18-

Megan would harm his family. Attorney McCollough had the impression Estes was going to talk to police even if she advised him not to do so. Finally, Attorney McCollough actively took part in the interview by asking follow-up questions to ensure that it was clear that Megan played an active role in Debbie's killing.

While the investigation did not last days or weeks, it was reasonably thorough to allow Attorney McCollough to make an informed and reasoned decision to go forward with the police interview. Estes "is unable to point to what additional proof or evidence could have been obtained by pre-trial counsel conducting a protracted investigation prior to permitting him to speak to the detective." *McGorman*, 489 S.W.3d at 744. Additionally, McCollough secured an agreement from the Commonwealth that it would not seek the death penalty if Estes's statement showed Megan was the instigator. "[I]n the judgment of pre-trial counsel, [Estes's] best defense, given the strong prosecution case against him, was to lessen his culpability by inculpating [Megan]." *Id.* While Estes ultimately received a longer sentence than Megan, the Commonwealth did not seek the death penalty against him. Accordingly, we cannot say that Attorney McCollough was ineffective in her investigation or preparation prior to the police interview.

Next, Estes argues that Attorney McCollough was ineffective when she failed to investigate "Estes's history of mental illness and any facts that would have made Estes categorically ineligible for the death penalty." As noted,

Attorney McCollough did speak with Estes before he gave his interview. She testified that she did not notice any behavior that caused her to be concerned that Estes's mental state was such that he could not make rational decisions or participate in his defense. While Estes may have been depressed, Attorney McCollough was not concerned that Estes was incompetent.

We do not agree that Attorney McCollough acted deficiently in this regard, either. While she could have done more, the record is clear that Attorney McCollough spoke with Estes and believed him to be competent to give a statement to police. Even *if* Attorney McCollough's failure to have a competency and mental health evaluation performed prior to the interview was deficient, however, Estes has not shown that any such failure was prejudicial. Indeed, he cannot do so because he was fully evaluated at KCPC shortly after the interview. Dr. Trivette determined that Estes was competent and there was no evidence of mental illness or mental retardation that would have impaired Estes's capacity to appreciate the criminality of his conduct or the ability to conform his conduct to the requirements of the law at the time of the alleged incident. And, likewise, Estes has failed to identify any mental illness that would have made him categorically ineligible for the death penalty had Attorney McCollough insisted on a comprehensive evaluation prior to the interview.

### C. *Motion to Recuse*

Estes argues that Judge Peckler should have granted his motion to recuse because Judge Peckler obtained personal knowledge of disputed evidentiary facts and did so by engaging in *ex parte* communication with Attorney McCollough. Estes asserts that it is clear that Judge Peckler enmeshed himself in the proceedings and formed extrajudicial opinions regarding Attorney McCollough's representation that biased his ability to rule on Estes's RCr 11.42 motion.

Because of our disposition of this case, however, this issue is moot. Estes's entitlement to relief is refuted by the face of the record; there are no discretionary decisions at issue or changes in Judge Peckler's factual findings made subsequent to the alleged *ex parte* communication. Therefore, any actions by Judge Peckler which allegedly may have been improper are irrelevant. Accordingly, we need not address this issue on the merits. *James v. Wilson*, 95 S.W.3d 875, 884 (Ky. App. 2002).

Nevertheless, we note that the timing of Estes's recusal motion would have justified its denial without further inquiry. The events at issue took place in August of 2013 shortly after Estes filed his *pro se* motion. The criminal trial took place in April of 2014. Yet, Estes did not move to recuse Judge Peckler until August of 2017. The doctrine of waiver justifies the trial court's denial of the

motion to recuse. "A motion for recusal should be made *immediately* upon discovery of the facts upon which the disqualification rests. Otherwise, it will be waived." *Bussell v. Commonwealth*, 882 S.W.2d 111, 113 (Ky. 1994) (citations omitted). The *Bussell* Court affirmed the trial court's denial of the motion to recuse, specifically because the defendant either had known or should have known of the basis for such motion for more than five months, yet waited until only a few days prior to trial to act on that information. The letters at issue were sent to the DPA in 2013, and Estes should have been aware of their content even before his trial took place.

### III. CONCLUSION

For the reasons set forth above, we affirm the orders of the Mercer Circuit Court.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Dennis J. Burke<br>Frankfort, Kentucky | Andy Beshear<br>Attorney General of Kentucky |
| Kara Stinson Lewis<br>Frankfort, Kentucky | Jesse L. Robbins<br>Assistant Attorney General<br>Frankfort, Kentucky |